STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, NORTH CAROLINA COTTON GINNERS ASSOCIATION, HERTFORD COUNTY BOARD OF EDUCATION, PITT COUNTY SCHOOL BOARD, BERTIE COUNTY BOARD OF EDUCATION, HALIFAX COUNTY BOARD OF EDUCATION AND ROBERT MORGAN, ATTORNEY GENERAL, APPELLEES v. VIRGINIA ELECTRIC AND POWER COMPANY, AND THE MUNICIPALITIES OF ROANOKE RAPIDS, AHOSKIE, PLYMOUTH, RICH SQUARE, ROPER AND WELDON, APPELLANTS

No. 76

(Filed 1 July 1974)

1. **Electricity § 3; Utilities Commission § 6— electricity furnished municipalities — private contracts — increase in rates by Utilities Commission**

The Utilities Commission had authority to increase the rates specified in contracts between municipalities and a power company prior to the expiration of such contracts since (1) the contracts themselves provided that the terms thereof fixing the rate for service were subject to modification by order of the Commission and (2) rates for public utility service fixed by an order of the Commission, otherwise lawful, supersede contrary provisions in private contracts concerning rates for such service.

2. **Electricity § 3; Utilities Commission § 6— statute allowing proposed rates to go into effect — supremacy over private contract**

The statute authorizing a utility to put its proposed rates into effect after the passage of six months from the filing of its application if no order has been entered by the Utilities Commission determining the validity of the proposed rates, G.S. 62-135, prevails over a private contract between municipalities and a power company fixing the rate for electricity furnished to the municipalities.

3. **Electricity § 3; Utilities Commission § 6— fair value — weighting of original and replacement costs**

The Utilities Commission did not err in its determination that the fair value of a power company's properties, exclusive of the allowance for working capital, should be determined by giving a weighting of one-third to replacement cost, depreciated, and a weighting of two-thirds to original cost, depreciated.

4. **Utilities Commission § 6— fair value — weight and credibility of evidence**

The credibility of the evidence and the weight to be given it in the determination of the "fair value" of a utility's properties are for the Utilities Commission, not the appellate court, to determine.

5. **Utilities Commission § 6— fair value — weighting of factors — appellate review**

An appellate court may not reverse the order of the Utilities Commission in a rate case because of its weighting of the respective

Utilities Comm. v. Power Co.

indicators of "fair value" unless the court finds such weighting to have been arbitrary and lacking support in the evidence, in view of the entire record, or otherwise affected by error of law. G.S. 62-94.

6. **Electricity § 3; Utilities Commission § 6— fair rate of return — dollar return — failure to consider fair value increment**

The Utilities Commission erred in its determination of a fair rate of return upon the fair value of a power company's property used and useful in rendering electric service in N. C. where the total dollar return which the power company is to be permitted to earn has not been increased by reason of the fair value increment (the excess of fair value over original cost depreciated) but is the same as the Commission would have allowed had the fair value of the properties been exactly the same as the company's actual net investment therein. G.S. 62-133(b).

7. **Electricity § 3; Utilities Commission § 6— working capital — addition to rate base**

A utility's own funds reasonably invested in materials and supplies and its cash funds reasonably held for payment of operating expenses, as they become due, fall within the meaning of the term "property used and useful in providing the service" as used in G.S. 62-133(b)(1) and are a proper addition to the rate base on which the utility must be permitted to earn a fair rate of return.

8. **Electricity § 3; Utilities Commission § 6— rate base — funds collected from customers for paying future expenses**

A utility is not entitled to include in its rate base funds which it has not provided but which it has been permitted to collect from its customers for the purpose of paying expenses at some future time and which it actually uses as working capital in the meantime since such funds are not "the public utility's property" within the meaning of G.S. 62-133(b)(1).

9. **Electricity § 3; Utilities Commission § 6— weighting of fair value factors — fair rate of return — working capital — subjective judgment — appellate review**

When the record, considered as a whole, contains substantial evidence supporting the subjective judgment of the Utilities Commission on the weighting to be given the respective indicators of "fair value," what constitutes a fair rate of return or the total amount reasonably necessary for working capital, the conclusion reached by the Commission may not be disturbed by a reviewing court merely because the court's subjective judgment is different from that of the Commission, nor is the Commission required to accept as conclusive the subjective judgment of a witness, even though the record contains no expression of a contrary opinion by another witness.

10. **Electricity § 3; Utilities Commission § 6— working capital — deduction of average customer deposits twice**

Where the Utilities Commission deducted an amount from working capital on account of customer deposits, the Commission erred in also including such amount in its computation of the deduction from working capital for "average tax accruals."

11. **Electricity § 3; Utilities Commission § 6— working capital — deduction for accrued income taxes — no tax liability during test period**

The Utilities Commission properly deducted from cash working capital an amount for accrued Federal income taxes even though the utility had no actual tax liability during the test period.

12. **Electricity § 3; Utilities Commission § 6— working capital — deduction for tax accruals — time lag between utility's receipt and payment**

The Commission's deduction from a utility's working capital on account of tax accruals was not erroneous by reason of the Commission's computation of the time lag between the utility's receipt of such money and its payment over to the tax collector.

13. **Electricity § 3; Utilities Commission § 6— operating expenses — no adjustment for past test period increases**

In this general rate case, the Utilities Commission did not err in failing to make an adjustment in operating expenses during the test period by reason of a salary and wage increase and an increase in Federal Social Security taxes, both known in the test period to be forthcoming but neither taking effect until after the end of the test period.

APPEALS by Virginia Electric and Power Company (hereinafter called Vepco) and by the Intervenor Municipalities (hereinafter called the Municipalities) from the decision of the Court of Appeals, reported in 21 N.C. App. 45, 203 S.E. 2d 418, affirming the order of the North Carolina Utilities Commission (hereinafter called the Commission) allowing an increase in rates charged by Vepco for retail electric service, Judge Parker dissenting on the ground that the Commission did not properly determine the rate of return which Vepco should be permitted to earn on the fair value of its properties.

On 27 July 1972, Vepco filed with the Commission its application for authority to increase in varying amounts its several schedules of rates for retail electric service in this State. Had the proposed increases been allowed in full, and been in effect throughout the calendar year 1971, they would have produced additional revenue in that year in the amount of $2,480,000. The Commission, by its final order in the matter, issued 28 June 1973, allowed the application in part, the total of the additional revenues which would have been produced in the twelve months' test period ending 30 June 1972, had the rates so approved by the Commission been then in force, would have been $962,685, approximately 38 per cent of the total increase sought by Vepco.

Vepco appealed, assigning numerous errors in the fixing of the rate base, the fixing of a fair rate of return thereon and the determination of Vepco's reasonable operating expenses.

The Municipalities (Roanoke Rapids, Ahoskie, Plymouth, Rich Square, Roper and Weldon) appealed on the ground that they were being served with power for street lighting and other governmental purposes under contracts specifying the rates to be charged for such service throughout a period which had not expired at the time of the application or at the time of the Commission's order. The Municipalities contend that the Commission is without authority to increase the rates specified in such contracts prior to the expiration thereof.

The Commission declared the matter a general rate case, suspended the proposed rate schedules pending its further order, set the matter for hearing and fixed the test period as the twelve months ending 30 June 1972.

Pursuant to G.S. 62-135, Vepco placed in effect on 1 March 1973 the full increases sought by it, giving the statutory undertaking for refunds to its customers of any amounts not finally approved by the Commission. The final order of the Commission directed Vepco to make such refunds of such excess collections.

Intervenors in opposition to approval of the requested increases in rates were the Attorney General, the Northeastern Cotton Ginners Association, and the Boards of Education of Hertford, Pitt, Bertie and Halifax Counties, in addition to the above named municipalities.

The application of Vepco also sought approval of the addition to each of its rate schedules of a "fossil fuel adjustment clause," by the operation of which clause the rates specified in the several schedules would automatically fluctuate up or down with changes in the cost of fossil fuel (coal, oil or gas) used by Vepco in generating power, the amount of such fluctuation in such rates being determined according to a formula described in the application. The order of the Commission denied approval of the proposed adjustment clause (hereinafter called the fuel clause). Vepco originally assigned this also as error, but, in its brief in the Supreme Court, asserts this question is now moot.

The hearing extended for nine full hearing days. Evidence, covering 560 pages in the printed record, plus large numbers of voluminous statistical exhibits to which the testimony of the expert witnesses relates, was received and considered by the Commission.

Only a relatively small part of Vepco's total electric plant and operations are in North Carolina. It serves also in Virginia

and in West Virginia, the bulk of its operations being in Virginia. Vepco sells electric power both at wholesale and at retail. The present proceeding relates only to its rates for retail service. By allocation factors developed and put in evidence by the staff of the Commission, to which no exception is taken, portions of the original cost of the properties comprising the total electric plant in service, the reserve for depreciation, the annual depreciation expense and the operating costs incurred in the operation of the entire system for the test year were allocated to the North Carolina retail service.

Vepco has in North Carolina two major hydroelectric generating plants, both on the Roanoke River, one at Roanoke Rapids and the other at Gaston. The combined capability of those two plants is 325,000 kilowatts. Vepco also has in North Carolina, at Kitty Hawk, two combustion turbines with a combined generating capability of 49,000 kilowatts. The evidence discloses no present plans for the expansion or curtailment of these facilities. Vepco has large steam generating plants in Virginia and West Virginia and it is in the process of building nuclear generating plants in Virginia.

The peak demand for Vepco power in 1972 was more than four times the peak demand in 1958 and Vepco estimates that the peak demand in 1976 will be 50 per cent greater than that in 1972. In anticipation of this tremendous growth in demand, and so in kilowatt hours sold, Vepco is engaged in an extensive construction program. Much of the additional plant will go into service after 1976. This construction program was estimated by Vepco to require its expenditure of $2,400,000,000, during the five year period 1972-1976, necessitating the attraction of tremendous quantities of additional capital, both debt and equity capital.

No substantial expenditures at Vepco's North Carolina generating plants are contemplated by reason of environmental protection needs. Substantial additional investment at generating plants outside North Carolina is contemplated for this purpose.

The portion of Vepco's total service territory which is growing most rapidly, in absolute terms, is in the Virginia "urban corridor," extending from the Potomac River through Richmond to Norfolk and Newport News, although percentage-wise Vepco is also experiencing substantial growth in kilowatt hour sales in North Carolina.

The Commission made the following findings of fact pertinent to this appeal:

"4. That the original cost depreciated of VEPCO's electrical plant in service subject to the Commission's jurisdiction * * * is $66,223,192 * * *

"5. * * * that the Replacement Cost is $91,020,210.

"6. That the working capital allowance found to be reasonable for VEPCO's North Carolina retail operations was determined by taking the cash working capital of $1,269,215 and adding to it materials and supplies, $1,619,088. Average tax accruals in the amount of $664,348, average customer deposits of $90,235, and a fuel payment lag of $203,254, were offsets to the working capital allowance, resulting in a net working capital allowance in the amount of $1,930,466 and that the amount of working capital is $1,930,466.

"7. That considering the reasonable original cost of the property, less that portion of the cost which has been consumed by previous use recovered by depreciation expense, and considering the replacement cost of said property and considering the condition of the property and the outmoded design of some of the older plant, the Commission finds that the fair value of said plant should be derived from giving two-thirds weighting to original cost and one-third weighting to replacement cost. By this method, the Commission finds that the fair value of the said plant devoted to retail service in North Carolina is $74,488,865 or $76,419,331 including $1,930,466 allowance for working capital.

"8. That after the Staff's accounting and pro forma adjustments and jurisdictional factors, VEPCO's revenue under present rates on an annualized basis for customers served at the end of the test period for North Carolina retail service was $21,456,589; that the reasonable operating revenue deductions of VEPCO during the test period was (sic) $16,634,693; that the net operating income for return at the end of the test period * * * was $4,818,079, giving a rate of return on depreciated original cost of plant of 7.07% ; a return on original cost equity of 9.87% and a return on fair value of 6.31%. That such rates are insufficient to provide a fair profit to VEPCO's stockholders considering

changing economic conditions, and insufficient to allow VEPCO to compete in the market for capital funds on terms which are reasonable and fair to its customers and existing investors.

"9. That the rate of return necessary on the fair value of VEPCO's property * * * is 6.89%, which rate of return will produce $962,685 of additional gross revenues on North Carolina retail electric service; and that the additional gross operating revenues of $962,685 will increase the net income available to the common stockholders from $2,069,730 to $2,515,500 for a rate of return on book value common equity of 12% and a rate of return on fair value common equity of 8.61%. The 12% rate of return on book value common equity would provide a before income tax interest coverage ratio of 2.61 times."

The Commission's final order also sets forth the following conclusions:

"The trended original cost study by Witness Reilly for the applicant has deficiencies which make it unacceptable as a complete and reasonable method for determining replacement cost. Instead of performing a time 'replacement cost study,' the witness computed the trended original cost of the properties and subtracted from the figure, thus derived an allowance for depreciation, which allegedly included some undetermined amounts for 'wear and tear, decay, action of the elements, inadequacy, obsolescence, changes in the art, changes in demand and requirements of public authorities.' While Mr. Reilly did account for advances in the art of construction, he made no attempt to determine the value of the utility plant as if the entire plant were designed in accordance with the present state of the art for the design and operation of electric systems, including modern technologies and efficiencies. In view of this and the previously stated fact that the Commission considers the replacement cost more than just a 'brick-for-brick' reproduction cost, the Commission finds the trended original cost method as employed insufficient as a complete and reasonable determination of replacement cost.

"The Commission believes the replacement cost which was determined merely by trending and depreciating original costs without proper consideration for improvements in plant design and efficiency is excessive. * * *

" \* \* \* [T]he Commission further concludes that the proper weighting, considering depreciated original cost, replacement cost, and the outmoded design of some of the older plant, is two-thirds weighting for original cost and one-third weighting for replacement cost. By this method the Commission determines the fair value of the said plant devoted to retail service in North Carolina to be $74,488,865 or $76,419,331 including $1,930,466 allowance for working capital.

\* \* \* \*

"The rates proposed by VEPCO are found to be unreasonable and unjustified to the extent that they produce any increase in annualized revenue on the customers at the end of the test period in excess of $962,685."

*Robert Morgan, Attorney General, I. Beverly Lake, Jr., Deputy Attorney General, Robert P. Gruber, Associate Attorney, and Jerry J. Rutledge, Associate Attorney, for the Using and Consuming Public.*

*Edward B. Hipp, Commission Attorney, Maurice W. Horne, Assistant Commission Attorney, and Jerry B. Fruitt, Associate Commission Attorney, for North Carolina Utilities Commission.*

*Joyner & Howison by R. C. Howison, Jr., Hunton, Williams, Gay & Gibson; Evans Brasfield, Guy Tripp and Allen Barringer for Virginia Electric and Power Company.*

*Crisp, Bolch & Smith by Thomas K. Bolch for the Municipalities.*

LAKE, Justice.

## APPEAL OF THE MUNICIPALITIES

[1] The appellant municipalities contend: (1) By reason of their respective contracts with Vepco for service at specified rates, the Commission has no authority to enter an order approving increases in those rates until the expiration of such contracts; (2) if this be not so, G.S. 62-135 does not authorize Vepco to increase such rates prior to the entry of an order by the Commission approving the increase. We find no merit in either of these contentions.

Each of the contracts in question contains this provision: "The provisions of this agreement are on file with the North

Carolina Utilities Commission and this agreement is subject to modification or cancellation by the Commission in the manner prescribed by law." The increases in the rates charged the municipalities were made by an order entered after a full hearing, held upon due notice and in which the appellant municipalities intervened as parties. The procedure prescribed by Chapter 62 of the General Statutes was followed. Thus, by the terms of the contracts, themselves, the provisions thereof fixing the rate for the service were subject to the change made by the order of the Commission.

Furthermore, even in the silence of the rate fixing contract upon this question, it is well settled in this State that rates for public utility service fixed by an order of the Commission, otherwise lawful, supersede contrary provisions in private contracts concerning rates for such service. *Corporation Commission v. Water Co.*, 190 N.C. 70, 128 S.E. 465; *Corporation Commission v. Manufacturing Co.*, 185 N.C. 17, 116 S.E. 178; *In re Utilities Co.*, 179 N.C. 151, 101 S.E. 619. The enforcement of such an order of the Commission does not constitute an impairment of the obligation of such contract, in violation of the Contract Clause of the United States Constitution, since contracts of public utilities, fixing rates for service, are subject to the police power of the State. *Union Dry Goods Co. v. Georgia Public Service Corp.*, 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309; *Atlantic Coast Line Railroad v. Goldsboro*, 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721; *In re Utilities Co., supra.* In this respect, there is no distinction between a contract made by the public utility with a municipality and one made by it with any other user of its service. *Corporation Commission v. Water Co., supra; In re Utilities Co., supra.*

The appellant municipalities cite in support of their position *Federal Power Commission v. Sierra-Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388, and *United Gas Pipeline Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373. These cases do not support the contention of the appellant municipalities. While holding that the Federal Power Act and the Federal Natural Gas Act do not evince a purpose to abrogate private contracts fixing rates and that such contracts may not be terminated by the unilateral act of the public utility company (see also, *Southern Utilities Company v. Palatka*, 268 U.S. 232, 45 S.Ct. 488, 69 L.Ed. 930), these cases recognize the authority of the Federal Power Commission to

prescribe a change in the rates fixed by such contracts whenever the Commission determines such rates to be unlawful. See also, *United Gas Company v. Memphis Light, Gas and Water Division*, 358 U.S. 103, 76 S.Ct. 368, 3 L.Ed. 2d 153.

It is in the public interest that a public utility company charge for its services rates which will enable it to maintain its financial ability to render adequate service and to attract the capital necessary for expansion and improvement of its service as needed. It is also in the public interest that there be no unreasonable discrimination between the users of such service. The police power of the state extends to the raising of rates fixed by private contract so as to accomplish either or both of these purposes.

[2]   G.S. 62-135 was enacted for the purpose of minimizing the effect of the unavoidable time lag between the filing of an application by a utility company for an increase in its rates for service and the entry of an order of the Commission finding such increase proper. This statute authorizes the utility to put its proposed rates into effect after the passage of six months from the filing of its application, if no order has been entered by the Commission determining the validity of the proposed rates, and if the utility company files its undertaking, approved by the Commission, for a refund of any portion of such rates ultimately disapproved by the Commission. Vepco did so in this case.

The appellant municipalities contend that this is a mere unilateral termination of its contracts by Vepco. It is true that the mere existence in the Commission of authority to increase the rates specified in its contract does not authorize Vepco at its own will to disregard such contract and to charge the other party thereto a higher rate. *Southern Utilities Company v. Palatka, supra.* If the rate put into effect by the utility, pursuant to G.S. 62-135, is completely disallowed by the Commission, after a hearing, the contract remains in effect and the utility must refund the excess so collected. Thus Vepco cannot, by its own decision alone, free itself from its contract.

G.S. 62-135 is a direct exercise of the police power of the State by the Legislature itself. Thus, it too prevails over a private contract in conflict therewith. In *Midland Realty Cocpany v. Kansas City Power & Light Co.*, 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540, the Supreme Court of the United States said:

"[The plaintiff] here insists that the contracts could not be abrogated 'without a proper hearing, finding, and

order of the Commission with respect thereto.' It does not, and reasonably could not, contend that immediate exertion by the legislature of the state's power to prescribe and enforce reasonable and non-discriminatory rates depends upon or is conditioned by specific adjudication in respect of existing contract rates. It is clear that, as against those specified in the contract here involved, the rates first filed by the plaintiff and those promulgated by the Commission in accordance with the statute have the same force and effect as if directly prescribed by the legislature."

Thus, the contracts between Vepco and the appellant municipalities do not bar Vepco from putting different rates into effect pursuant to G.S. 62-135, pending the final determination by the Commission.

## APPEAL OF VEPCO

Vepco made 30 assignments of error to the findings, conclusions and order of the Commission. The majority of the Court of Appeals found no error which it considered "sufficiently prejudicial to justify a remanding of the cause to the Utilities Commission."

One of the assignments of error was to the failure of the Commission to approve Vepco's proposed fossil fuel adjustment clause. In its brief in this Court, Vepco states that a subsequent order of the Commission authorizing Vepco to put into effect a fossil fuel adjustment clause has made this assignment of error moot. Apparently, the subsequent order to which Vepco refers was entered in another proceeding. It is not presently before us. Consequently, on this appeal we do not have before us any question as to the propriety of any fuel adjustment clause, either that proposed by Vepco in the present proceeding or that said to have been approved by the Commission after its entry of the order to which this appeal relates. We, therefore, express no opinion as to the right of an electric utility to make a fuel adjustment clause a part of its rate schedules, or any of them, when such clause has not been approved by the Commission.

The remaining assignments of error made by Vepco relate to three major contentions: (1) The Commission erred in determining the fair value of Vepco's properties, used and useful in rendering electric retail service in this State, by its failure to give proper weight to the replacement cost of such properties; (2) the Commission erred by its failure to determine properly

the fair rate of return which Vepco is entitled to earn on the fair value of its properties; (3) in determining Vepco's rate base, specifically the allowance therein for working capital requirements, and in determining the allowance for certain operating expenses, the Commission made certain accounting errors. We turn now to these contentions.

### (1)  The Weighting Of Replacement Cost

[3]    For the reason stated more fully in *Utilities Commission v. Duke Power Co.*, 285 N.C. 377, 206 S.E. 2d 269, decided this day, we find no reversible error in the Commission's determination that the fair value of the properties, exclusive of the allowance for working capital, should be determined by giving a weighting of one-third to replacement cost, depreciated, and two-thirds weighting to original cost, depreciated.

The Commission found the replacement cost of the properties allocable to retail electric service in North Carolina was $91,020,210. This figure was derived by applying allocation factors developed by the Commission staff to the figure computed by Vepco's witness, Mr. Reilly, as the replacement cost of Vepco's entire plant. Thus, the Commission accepted Vepco's figure for replacement cost of its entire plant. Vepco does not take exception to the allocation factors or to the figure so derived by the Commission for the replacement cost of the property allocable to retail service in North Carolina, nor does it except to the Commission's finding that the original cost, depreciated, of such properties was $66,223,192. Its sole contention, as to this point, is that the Commission should have given greater weight to replacement cost in its computation of the fair value of the properties as of the end of the test period, Mr. Reilly having testified that, in his opinion, the weighting should be exactly reversed, i.e., two-thirds weighting to replacement cost and one-third weighting to original cost.

G.S.  62-133 (b) (1)  provides that the Commission shall ascertain the fair value of the properties "considering" the "reasonable original cost," depreciated, and "the replacement cost" and "other factors relevant to the present fair value of the properties."

[4]    As we have said many times, the credibility of the evidence and the weight to be given it in the determination of the "fair value" of the properties are for the Commission, not for this Court, to determine. *Utilities Commission v. Duke Power Co.*,

*supra; Utilities Commission v. Telephone Co.,* 281 N.C. 318, 358, 360, 189 S.E. 2d 705; *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 454, 146 S.E. 2d 787; *Utilities Commission v. Public Service Co.,* 257 N.C. 233, 237, 125 S.E. 2d 457; *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133. The Commission is not required to accept Mr. Reilly's opinion as to the weight to be given to each of these indicators of fair value, even though there be no contrary expert testimony. As Mr. Reilly testified, the determination of the weighting to be given the indicators is a matter of "subjective judgment." The Commission may and should exercise its own expert judgment in this determination.

In explanation of its weighting of original cost, depreciated, and replacement cost, the Commission said that it considered "the condition of the property and the outmoded design of some of the older plant." It noted that, in his computation of replacement cost, "While Mr. Reilly did account for advances in the art of construction, he made no attempt to determine the value of the utility plant as if the entire plant were designed in accordance with the present state of the art for the design and operation of electric systems including modern technologies and efficiencies." Mr. Reilly's own testimony gives support to this conclusion. He testified as follows:

"In arriving at my opinion * * * I have *considered* all of the causes of depreciation which are mentioned in my definition of depreciation. * * * *Obsolescence* is taken care of through depreciation and not through the trending process. * * * I did not make a separate determination of the amount of depreciation due to each of the causes which I included in my definition of depreciation, for as a practical matter it is not possible, because electrical property is retired from service due to a combination of one or more of the causes mentioned. * * *

"A weighting of one-third original cost depreciated and two-thirds trended original cost depreciated was used to determine the fair value of the property [which Mr. Reilly computed as $86,317,000]. * * * *This weighting was made on my judgment.* * * * *The determination of the fair value of utility property for rate making purposes is not an exact science;* and such determination is not based on the application of a precise mathematical formula. * * * (Emphasis added.)

"I would *not* describe what I did to arrive at an esti-mate of fair value as a replacement cost study envisioning replacing the utility plant in accordance with modern design and technique and the most up-to-date changes in the state of the art. What I did was to trend the original cost of the study up to the present day, this June 30, 1972, price level. That was restating the cost of the plant *as it existed* at June 30, 1972, and making allowance for any factors of obsolescence, inadequacy or whatever in the depreciation that was applied to that trended cost. (Emphasis added.)

" * * * *This [weighting] is a subjective judgment, really, in the final analysis, based on experience within reasonable limits.*" (Emphasis added.)

We think it evident that what Mr. Reilly did was to trend the original cost of each of the great number of items in the Vepco electric system to the present day price level and to sub-tract from each of the several components of the system an amount which, in his expert opinion, was the proper deduction for the physical wear and tear and obsolescence of that com-ponent.

[5] Obsolescence of a large plant is not necessarily limited to the sum of the allowances for obsolescence of its component parts. For example, a steam locomotive or an ocean-going sailing vessel may be in excellent physical condition and its several com-ponent parts may not be obsolete, provided one wishes to build a steam locomotive or an ocean-going sailing vessel. Nevertheless, both are obsolete because a wholly new type of motive power has been developed. One cannot be said to have acted arbitrarily and capriciously merely because he concludes that the present "fair value" of such a locomotive, or sailing ship, is much less than its replacement cost diminished by an allowance for physi-cal depreciation and obsolescence of its several component parts, considered separately, or even less than its original cost so de-preciated. This Court may not reverse the order of the Commis-sion because of its weighting of the respective indicators of "fair value," unless we find such weighting to have been arbi-trary and lacking support in the evidence, in view of the entire record, or otherwise affected by error of law. G.S. 62-94.

In this record, Vepco, through the testimony of its executive officers, asserts that it has an immediate need to attract huge quantities of capital for the construction of new generating

facilities and that these facilities will be designed for the use of nuclear power, a wholly new concept in generation of electric power. Through the testimony of another witness, Mr. Reilly, Vepco asserts that its present generating plants have a "fair value" much nearer to the present cost of replacing them than to their original cost. It is not for this Court to determine whether there is any inconsistency in this evidence, but it is for the Commission to make such determination. It has done so and we are unable to conclude from the record before us that its determination is arbitrary or unsupported by substantial evidence in the entire record.

Neither original cost, depreciated, nor replacement cost, depreciated, is the measure of "fair value," as that term is used in G.S. 62-133 (b) (1). They are indicators of "fair value" and their respective weights are to be determined by the Commission in its expert judgment. We must not overlook the fact that the Commission, unlike the typical jury, accumulates, through its own experience in supervising the public utilities serving in this State, a substantial general knowledge of their properties and service. The statute contemplates that the Commission will use this general knowledge and its own expert judgment in weighing the indicators of "fair value."

### (2)  The Determination of a Fair Rate of Return

[6]   The Commission determined that the fair rate of return upon the fair value of Vepco's property used and useful in rendering retail electric service in North Carolina is 6.89 per cent.

It is clear from the Commission's order that the Commission made this determination by the same process of calculation which we found to be an error of law in *Utilities Commission v. Duke Power Co., supra.* Having concluded that a fair rate of return to Vepco upon the equity component of its actual capital structure is 12 per cent (higher than the return believed to be fair by expert witnesses for the Commission staff and for the Attorney General and lower than the return believed to be fair by expert witnesses for Vepco), the Commission multiplied the equity component of Vepco's actual capital structure (its common equity capital plus its retained earnings) by 12 per cent and determined that the return of $2,515,500 was a fair dollar return thereon. Adding this to the amounts required to pay interest on the debt component of Vepco's actual capital structure and dividends on the preferred stock component, the Commis-

sion computed that $5,260,406 was a fair dollar return to Vepco on its entire capital invested in its electric power system. The Commission then made the mathematically correct computation that the dollar return of $2,515,500 is a rate return of 8.61 per cent on the common equity component of the actual capital structure plus the fair value increment (the excess of fair value over original cost depreciated). When taken in conjunction with the interest requirement on Vepco's debt capital and the dividend requirement on its preferred stock capital, this equated to a rate of return of 6.89 per cent on the fair value of the properties, which rate of return the Commission found to be fair.

As we noted in *Utilities Commission v. Duke Power Co.,* *supra,* in this computation the total dollar return which Vepco is to be permitted to earn has not been increased at all by reason of the fair value increment. It is exactly the same as the Commission would have allowed had the fair value of the properties been exactly the same as Vepco's actual net investment therein. For the reasons stated in *Utilities Commission v. Duke Power Co., supra,* this is not in accord with the mandate of G.S. 62-133(b), as construed by us in *Utilities Commission v. Telephone Co.,* 281 N.C. 318, 189 S.E. 2d 705. Consequently, this proceeding must be remanded to the Commission for compliance with that mandate.

Here, as in *Utilities Commission v. Duke Power Co., supra,* our decision is not to be deemed a direction to the Commission to revise its order so as to permit Vepco to make an additional increase of its rates sufficient to yield additional net income, after taxes, equal to 12 per cent of the fair value increment. Here, as in that case, it is for the Commission, not for this Court, to determine what is a fair rate of return. For the reasons stated in *Utilities Commission v. Duke Power Co., supra,* the Commission may, in its own expert judgment, find that a fair rate of return on Vepco's equity capital, including the fair value increment, is less than 12 per cent (the rate of return it found fair without taking the fair value increment into account). How much less, if any, is for the Commission, not for this Court, to determine.

In the record before us, Dr. Phillips, Vepco's expert witness on fair rate of return, testified that when the fair value increment, as computed by Mr. Reilly (substantially larger than that found by the Commission) was added to the equity component of the actual capital structure of Vepco, the fair *rate* of

return on the equity component would be less than that which he had computed on the basis of the actual capital structure. Just as Mr. Reilly did concerning his weighting of the indicators of fair value, Dr. Phillips testified that the determination of fair rate of return on equity capital is a matter of "subjective judgment." The Commission is, of course, not obliged to adopt as its own Dr. Phillips' opinion as to the precise effect of the fair value increment upon the fair rate of return, notwithstanding his having been the only witness to testify on that subject. This is especially true in view of his patently erroneous testimony on cross-examination: "I am saying here that with a fair value rate base, this company requires a higher *rate* of return than it would on an original cost rate base." (Emphasis added.) As observed by us in *Utilities Commission v. Duke Power Co., supra,* the Commission may, upon the remand here ordered, conduct a further hearing at which expert testimony may be sought upon the question of what is the effect of the fair value increment which has now been actually found by the Commission upon the *rate* of return which it should find to be fair.

### (3) The Alleged Errors of Accounting

After finding the fair value of the properties of Vepco used and useful in rendering retail electric service in North Carolina, the Commission fixed the rate base by adding to such "fair value" an allowance of $1,930,466 for working capital. It arrived at this figure in the following manner stated in its Finding of Fact No. 6:

> "That the working capital allowance found to be reasonable for VEPCO's North Carolina retail operations was determined by taking the cash working capital of $1,269,215 and adding to it materials and supplies, $1,619,088. Average tax accruals in the amount of $664,348, average customer deposits of $90,235, and a fuel payment lag of $203,254, were offsets to the working capital allowance, resulting in a net working capital allowance in the amount of $1,930,466 and that the amount of working capital is $1,930,466."

[7] Like any other business, a public utility must at all times have on hand a reasonable amount of materials and supplies and a reasonable amount of funds for the payment of its expenses of operation. While Chapter 62 of the General Statutes makes no reference to working capital, as such, the utility's own funds reasonably invested in such materials and supplies and its cash

funds reasonably so held for payment of operating expenses, as they become payable, fall within the meaning of the term "property used and useful in providing the service," as used in G.S. 62-133 (b) (1), and are a proper addition to the rate base on which the utility must be permitted to earn a fair rate of return.

[8] Conversely, the utility is not entitled to include in its rate base funds which it has not provided but which it has been permitted to collect from its customers for the purpose of paying expenses at some future time and which it actually uses as working capital in the meantime. Such funds, so supplied by the customers, are "used and useful in rendering the service" and the utility, having lawfully collected them, is the owner thereof. Nevertheless, such funds, so collected from the customers and used by the utility as working capital, are not "the public utility's property" within the meaning of G.S. 62-133 (b) (1). In *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.*, *supra*, at page 348, this Court, speaking through Justice Barnhill, later Chief Justice, said:

> "When, in fixing rates, which will produce a fair return on the investment of a utility, it is made to appear it has on hand continuously a large sum of money it is using as working capital and to pay current bills for materials and supplies, that is a fact which must be taken into consideration. And if the fund on hand is sufficient, no additional sum should be allowed at the expense of the public."

[9] Chapter 62 of the General Statutes does not state a formula by which the Commission is to determine what is a reasonable amount to be added to the rate base for working capital. Vepco's witness Reilly testified that the weighting to be given the respective indicators of "fair value" is a matter for "subjective judgment." Vepco's witness Phillips testified that the determination of what constitutes a fair rate of return must also be determined by "subjective judgment." Likewise, the total amount reasonably necessary for working capital is a matter requiring the exercise of subjective judgment. When the record, considered as a whole, contains substantial evidence supporting the subjective judgment of the Commission on any of these factors in the fixing of reasonable rates, the conclusion reached by the Commission may not be disturbed by a reviewing court merely because the court's subjective judgment is different from that of the Commission, nor is the Commission required to accept as con-

clusive the subjective judgment of a witness, even though the record contains no expression of a contrary opinion by another witness.

Vepco does not take exception to the Commission's finding as to the total working capital required by it. Its contention is that the deductions therefrom by the Commission on account of funds collected in advance from the customers and actually used as working capital, while being held for ultimate disbursement for taxes, fuel bills and other expenses, were improperly computed.

[10] Vepco contends that the deduction of $90,235 on account of customer deposits was error because this amount was also included in the computation of the deduction for "average tax accruals." In its brief in the Court of Appeals, the Commission concedes that it thus inadvertently deducted the "average customer deposits" twice. The effect of this is to understate the rate base by $90,235 and so to deprive the company of approximately $6,200 in allowable return. While it would hardly be practicable to spread such a relatively small amount among Vepco's ratepayers in the form of a further increase in their rates, the Commission may take it into account, along with its error in computing the fair rate of return, in the further proceedings which must be had.

Vepco also contends that the Commission made too large a deduction from the working capital allowance on account of tax accruals. The rates for service paid by the customers are fixed so as to produce, in addition to other amounts, the sums necessary to pay Vepco's taxes, including its income taxes. Of necessity, the ratepayers pay into Vepco for this purpose, as they use electricity, money which Vepco does not have to pay over to the tax collector until a substantially later period. Meanwhile, Vepco has the use of these funds and does use them as working capital.

[11] Vepco contends that the testimony and exhibit of Mr. Thomas, the accounting witness for the Commission staff, shows that, during the test period, Vepco actually had a negative figure for its Federal income tax liability attributable to its North Carolina retail operations. Consequently, says Vepco, the Commission was in error in including in its deductions from cash working capital $60,783 for accrued Federal income taxes. The absence of an actual tax liability during the test period does not

alter the fact that Vepco's North Carolina customers have paid to it rates which included enough to cover anticipated Federal income taxes. The question here is not how much, if anything, Vepco must pay to the United States. The questions are how large a fund Vepco has collected from its customers with which to pay taxes and how long it has had the use of such fund. Having had the use of funds so collected, it is not entitled to ignore its use thereof when computing its working capital requirement. We see no error in the order of the Commission in this respect.

[12]   Vepco further contends that the Commission's deduction from working capital on account of tax accruals is overstated for the reason that the Commission's computation of the time lag between Vepco's collections from its customers and its payments to the tax collector overlooks an offsetting lag between the date Vepco bills its customers and the date the customers pay Vepco. The proper computation of the time lag between Vepco's receipt of such money and Vepco's payment over to the tax collector is a matter of accounting as to which the Commission's accountant and Vepco's accountant are in disagreement. We are unable to find from the record any error of law in the Commission's computation of this portion of the deduction to be made from Vepco's full working capital requirements.

[13]   Vepco also complains of the failure of the Commission to make a pro forma adjustment in its actual operating expenses during the test period by reason of a salary and wage increase and an increase in Federal Social Security taxes, both known in the test period to be forthcoming but neither taking effect until after the end of the test period. In this we find no error of law. In *Utilities Commission v. City of Durham,* 282 N.C. 308, 320, 193 S.E. 2d 95, we said:

> "The actual experience of the company *during the test period,* both as to revenues produced by the previously established rates and as to operating expenses, is the basis for a reasonably accurate estimate of what may be anticipated in the near future if, but only if, appropriate pro forma adjustments are made for abnormalities which existed in the test period and for changes in conditions *occurring during the test period* and, therefore, not in operation throughout its entirety." (Emphasis added.)

Adjustments for post test period increases in certain categories of expense may well give a distorted picture of the need

for revenue since post test period experience in other categories of expense is not known and the possibility of offsetting adjustments is not precluded. As a practical matter, there must be a cut-off date for the making of adjustments. Chapter 1041 of the Session Laws of 1973, Second Session, 1974, has no application to this matter.

We have considered and find no merit in Vepco's remaining assignments of error.

By reason of the Commission's error in its computation of the fair rate of return upon the fair value of the properties of Vepco, used and useful in rendering retail electric service in North Carolina, the judgment of the Court of Appeals is reversed and this matter is remanded to that court with direction that it enter its judgment further remanding the matter to the Utilities Commission for further proceedings by the Commission not inconsistent with this opinion.

Reversed and remanded.