Peter W. BOWMAN, M.D.

v.

MAINE STATE EMPLOYEES
APPEALS BOARD et al.

Supreme Judicial Court of Maine.

Dec. 4, 1979.

Murray, Plumb & Murray by Peter L. Murray (orally), Portland, for plaintiff.

Morton A. Brody, Waterville, Robert J. Stolt, Deputy Atty. Gen. (orally), Augusta, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

ARCHIBALD, Justice.

In 1971 Peter W. Bowman, M.D., was a classified state employee, serving as Superintendent of Pineland Hospital and Training Center (Pineland). P.L.1971, ch. 350, removed Dr. Bowman's position from classified state service and created a 4-year term in the unclassified state service for the superintendency of Pineland. Dr. Bowman was not appointed to this position by the Commissioner of Mental Health and Corrections. He appealed to the Maine State Employees Appeals Board (Board), which rejected his appeal. Dr. Bowman then sought review of the Board's decision by instituting an action pursuant to Rule 80B, M.R.Civ.P. A justice of the Superior Court ruled the Board had correctly determined that no First and Fourteenth Amendment rights had been violated and denied the 80B action which sought "appeal and reversal" of the decision of the Board. From this judgment Dr. Bowman has appealed. We deny the appeal.

At the time of his dismissal from state service, Dr. Bowman had served the state for approximately eighteen and one-half years. Originally, he was appointed Superintendent of what was then Pownal State School (later Pineland). Some four years later that position was brought within the classified civil service system as a result of the enactment of P.L.1957, ch. 313,[1] but fourteen years later was removed therefrom and, together with the positions of superintendent of the Augusta and Bangor Mental Health Institutes, was added to the unclassified service by the enactment of P.L.1971, ch. 350, § 1, amending 5 M.R.S.A. § 711(2)(A)(13).

Dr. Bowman's appeal is focused primarily on constitutional grounds. Initially, he asserts that the termination of his public employment violated concepts of due process under both the United States and Maine Constitutions. Secondly, he contends that the application of P.L.1971, ch. 350, to him violated his contractual due process rights. His final position is that the 1971 act contravened an existing contract with the State of Maine and, therefore, violated the contract clauses of both the United States and Maine Constitutions.

It is basic to our resolution of this appeal to determine whether a contractual relationship had in fact existed between Dr. Bowman and the state. If there were no such relationship, then Dr. Bowman's dismissal could not violate any rights he then had as a member of the classified service. Furthermore, if his position was not constitutionally protected, the 1971 Legislature was free to enact chapter 350 without regard to its application to Dr. Bowman. Therefore, we turn initially to the question of whether the contract clauses can avail Dr. Bowman in his quest for a declaration that his dismissal was improper. This is the same approach taken by a three judge District Court[2] faced with a challenge from several Massachusetts justices who were claiming that both the due process clause, U.S.Const. Amend. XIV, § 1, and the contract clause, U.S.Const. art. I, § 10, cl. 1, protected them from the provision of a newly enacted statute mandating retirement at age seventy. The court held: "Since . . . the claimed right is one alleged to be created by contract, we must first ascertain whether a protectable right exists, before we reach the question whether its deprivation involves a violation of due process." *Kingston v. McLaughlin*, 359 F.Supp. 25, 28 (D.Mass.1972).

Does a public employee have such a relationship to the government, whether state or federal, that he can invoke the contract clause[3] in the event his position is terminated by legislative act?

Our reading of decisions of the United States Supreme Court, as well as those of courts of last resort of several of our sister states, leads us to conclude that public employment is not necessarily premised on contractual concepts.

Contracts with governmental agencies may be constitutionally protected, however, provided that there is legislative authority for the agencies to enter into a contractual relationship. When such a relationship is created, the contract clause protects against any subsequent dilution of contractual obligation. In the recent case of *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), it was held that legislative enactments of the State of New York and the State of New Jersey violated the contract clause when a certain source of income was removed from its previously dedicated status, this source of income having been dedicated to bond amortization when the Port Authority of New York and New Jersey had issued its bonds. The Supreme Court held that since both states had statutorily authorized the issuance of bonds supported by dedicated

---

1. A classified state employee is given a status and awarded certain rights distinguishable from a state employee who is in the unclassified service. *See* for comparison, 5 M.R.S.A. §§ 671–679–A and 5 M.R.S.A. § 711.

2. Coffin, Chief Circuit Judge; and Pettine and Freedman, District Judges.

3. Me.Const. art. I, § 11.

revenues, the bonds, when issued, created a contract between the Port Authority and the holders thereof. The court pointed out that the initial covenant "constituted a contract between the two States and the holders of the Consolidated Bonds," and that "[t]he intent to make a contract is clear from the statutory language." 431 U.S. at 18, 97 S.Ct. at 1515.

*Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938), construed the relationship between a tenured school teacher and her employer, commenting that "[t]he courts of Indiana have long recognized that the employment of school teachers was contractual." The court there held that the repeal of a statute some nine years after tenure rights had been established was an impairment of the teachers' contractual rights and protected by the contract clause. *Id.* at 105, 58 S.Ct. 443.

*Phelps v. Board of Education*, 300 U.S. 319, 322, 57 S.Ct. 483, 81 L.Ed. 674 (1937), was a case where the New Jersey Supreme Court had construed a New Jersey statute as failing to establish a contractual relationship between the state and a school employee. The United States Supreme Court, reflecting its respect for a state court's interpretation of its own statutes, approved that conclusion.

The United States Supreme Court, again giving great weight to the views of a state court in construing its own statutes, followed its decision in *Phelps* by upholding an act of the Illinois Legislature which had been challenged under the contract clause. The court held:

> On the other hand, an act merely fixing salaries of officers creates no contract in their favor and the compensation named may be altered at the will of the Legislature. This is true also of an act fixing the term or tenure of a public officer or an employe of a state agency. The presumption is that such a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the Legislature shall ordain otherwise. He who asserts the creation

of a contract with the state in such a case has the burden of overcoming the presumption.

*Dodge v. Board of Education*, 302 U.S. 74, 78–79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937) (citations omitted).

In recent years various state courts under a variety of circumstances have been faced with determining whether a contractual relationship existed between a person and the governmental agency employing such person. The Pennsylvania Court has held that unless the statute authorizes the creation of a contractual relationship:

> An appointment to a public office for a fixed term and salary is not a contract within the protection of the Constitution. . . . The compensation is incidental to the office and is governed by the right thereto. The emoluments are annexed to the office and not to the person; hence the salary belongs to the officer, de jure. If the officer is properly dismissed, the salary ceases.

*Naef v. City of Allentown*, 424 Pa. 597, 601, 227 A.2d 888, 891 (1967). *See also Vega v. Borough v. Burgettstown*, 394 Pa. 406, 409, 147 A.2d 620, 622 (1959).

The California courts carefully distinguished between the rights which have become vested under the terms of employment and those which are of a continuing nature. *Betts v. Bd. of Admin. of Pub. Emp. Ret. System*, 21 Cal.3d 859, 148 Cal. Rptr. 158, 582 P.2d 614 (1978).

In *Miller v. State*, 18 Cal.3d 808, 135 Cal.Rptr. 386, 389, 557 P.2d 970, 973 (1977), the California Supreme Court was faced with a problem somewhat similar to that now before us. Miller was employed in state service as Chief Inheritance Tax attorney and, because of a change in statutory retirement provisions, was compelled to retire after thirty-five years of service at the age of sixty-seven. Had the law which governed during most of his service been retained, he would have been able to serve three additional years and thus to increase his monthly pension by nearly $500. In construing a 1971 act which Miller had argued violated the United States' as well as

the State's constitutional provisions against the impairment of contract, the California Court held:

> [P]ublic employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law. . . . Nor is any vested contractual right conferred on the public employee because he occupies a civil service position since it is equally well settled that '[t]he terms and conditions of civil service employment are fixed by statute and not by contract.'

135 Cal.Rptr. at 389, 557 P.2d at 973 (citations omitted), *quoting Boren v. State Personnel Board,* 37 Cal.2d 634, 641, 234 P.2d 981, 985 (1951).

The Georgia court, construing an act which repealed a city charter resulting in the loss of employment by several municipal officials, held:

> The Act of the General Assembly revoking the charter of the City of Mountain View does not operate to impair the obligation of contracts claimed under by the parties . . . in violation of state and federal Constitution. . . . The right of an incumbent to an office depends upon the law under which he holds. If the law is capable of being repealed, the right of the officer is gone.

*City of Mountain View v. Clayton Cty.,* 242 Ga. 163, 167–168, 249 S.E.2d 541, 544 (1978). Other jurisdictions have reached similar conclusions. *See, e. g., Fazekas v. University of Houston,* 565 S.W.2d 299, 307 (Tex.Civ. App.1978); *State ex rel. Utilities Com'n v. Virginia E. & Power Co.,* 285 N.C. 398, 206 S.E.2d 283 (1974); *Schmidt v. Masters,* 7 Or.App. 421, 490 P.2d 1029 (1972); *Reynolds v. Comm. of Commerce and Development,* 350 Mass. 193, 214 N.E.2d 69 (1966); *City of Elizabethtown v. Cralle,* 317 S.W.2d 184 (Ky.1958); *Houghton v. School Committee of Somerville,* 306 Mass. 542, 28 N.E.2d 1001 (1940).

Applying the foregoing concepts to the facts of this case, it is our conclusion that Dr. Bowman did not have a relationship with the State of Maine governing his employment at Pineland which was protected by either the contract clause in the Maine Constitution or that of the Constitution of the United States. The position of Superintendent of Pineland was brought under the classified service in 1957, four years after Dr. Bowman began his employment. The 1957 act related to the *position* of Superintendent of Pineland and not to Dr. Bowman personally. It cannot be gainsaid that if the 1957 Legislature had the power to include this position under the classified service, the 1971 Legislature likewise had the power to remove it therefrom. *Shamberger v. Ferrari,* 73 Nev. 201, 314 P.2d 384, 387 (1957). It must be remembered that we are not concerned with Dr. Bowman's right to whatever emoluments he may be entitled to as a result of his years of service. *Betts v. Bd. of Admin. of Pub. Emp. Ret. System, supra.* We are concerned only with his right to continue in his position as Superintendent of Pineland.

We are further supported in our conclusion by the phraseology of the 1957 act placing the superintendency of Pineland in the classified service. There was no language in that act authorizing the execution of a continuing type of employment contract, as was the case in *Indiana ex rel. Anderson v. Brand, supra.*

The Maine legislature has demonstrated its ability to delegate to governmental agencies the authority to enter into contractual relations with others. The educational field is illustrative.

20 M.R.S.A. § 58 provides:

> The Commissioner of Educational and Cultural Services is authorized to enter into *contract* with any academy or institute, which is serving one or more communities in lieu of a public secondary school, for the conduct of a vocational course or vocational courses which meet the same standards for approval as those conducted in public secondary schools. [emphasis supplied]

20 M.R.S.A. § 153 empowers a school committee to "contract" with a superin-

tendent "for a term of not more than 5 years." Section 161(5) of that title authorizes school officials to execute contracts for tenured teachers, with the added power to extend "the contract . . . automatically for one year" but subject to "the right to an extension for a longer period of time through a new contract."

We have recognized that a contract between a teacher and his governmental employer is enforceable for its breach and that such an employer is bound by its terms. *Kenaston v. School Administrative District # 40*, Me., 317 A.2d 7, 10 (1974). Even so, a teaching contract, since it cannot guarantee an unalterable future rate of pay, only creates a vested right to the salary *earned* under the contract. *Sawin v. Town of Winslow*, Me., 253 A.2d 694, 700 (1969).

By contrast, P.L.1957, ch. 313, merely provided that the "Commissioner shall have the power *to appoint* institutional heads as shall be necessary." (emphasis supplied) Thus, statutory authority to contract for a continuation of the right to employment did not exist.

Having determined that P.L.1971, ch. 350, was validly enacted and cannot be said to have violated either contract clause, we dispose of Dr. Bowman's argument that his right to due process was infringed. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

As we read P.L.1971, ch. 350, its rationality is self-apparent. The three state operated mental institutions, Augusta and Bangor Mental Health Institutes, and Pineland, were placed in the same administrative category, and the appointment of the three superintendents was centralized under the control and supervision of the Commissioner of Mental Health and Corrections. 34 M.R.S.A. § 1. The commissioner's term is "coterminous with the governor." P.L.1971, ch. 350, § 3, specified that the appointment of any of the superintendents be for "a term of 4 years . . . or during the pleasure of the commissioner." It would thus appear the legislature deemed it appropriate that the term of office of the superintendent of any of the three mental institutions be compatible with that of the Commissioner of Mental Health and Corrections who, in turn, would serve at the pleasure of the governor.[4]

The fact that this particular act arguably may have resulted in an injustice to a long-term office holder may not serve as a basis of a due process challenge to legislation rationally related to a legitimate legislative purpose. One of the perpetual risks of public employment is an abolition of a position by the legislative branch of government.

Dr. Bowman's due process arguments must fail. As was the situation in *Kingston v. McLaughlin*, 359 F.Supp. 25 (D.Mass. 1972), the root from which these due process contentions sprout is the premise that Dr. Bowman's position was contractually secured, a premise we have here disavowed. The foundation of the due process argument having been eliminated, the argument itself must collapse.

The South Carolina Court has used appropriate language:

'Public officers are created for the benefit of the commonwealth, incumbents have no contract or property rights in them, and, unless it be otherwise provided by the Constitution, they are subject en-

---

4. We viewed with approval such legislative rationale in *Longley v. State Emp. Appeals Bd.*, Me., 392 A.2d 529, 532 (1978), when we commented regarding a policy-making position:

It is a policy-making position similar to that of a cabinet minister's on the federal level. A new Governor is entitled to fill such a position with a person of his own choosing. He is not required to work with the appointees of a previous administration, whose loyalties and policies might be wholly different from his own.

It is a logical extension of the philosophy in *Longley* to say that a Commissioner of Mental Health and Corrections should be entitled to his own appointees as superintendents of the three hospitals since the legislature has mandated that these institutions be under the "control and supervision" of the Commissioner, the superintendencies being legislatively defined as "major policymaking positions." 5 M.R.S.A. § 711(2)(A).

tirely to legislative control. Hence, subject to the Constitution, the General Assembly may fix the term, provide for removal, abolish the office, reduce the term, and in every respect control the existence, powers, emoluments, and tenure of public officers.'

*Wright v. City of Florence*, 229 S.C. 419, 93 S.E.2d 215, 220 (1956), *quoting State v. Rhame*, 92 S.C. 455, 75 S.E. 881, 883 (1912).

We conclude that P.L.1971, ch. 350, as it related to the superintendent of the Pineland Hospital and Training Center, does not violate the contract clause of either the United States or Maine Constitutions by placing the position in the unclassified service.

The entry is:

Appeal denied.

Judgment affirmed.

POMEROY and DELAHANTY, JJ., did not sit.