STATE OF NORTH CAROLINA, EX REL, UTILITIES COMMISSION, CITY
OF DURHAM, MONROE-UNION COUNTY CHAMBER OF COM-
MERCE, AND ROBERT MORGAN, ATTORNEY GENERAL v. GENERAL
TELEPHONE COMPANY OF THE SOUTHEAST

No. 43

(Filed 10 October 1974)

1. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—**
   **telephone rates — inadequate service due to bad management — effect**
   **on fair rate of return — denial of rate increase**
   When, upon substantial evidence, a public utility is found to be
   rendering grossly inadequate service due to bad management and man-
   agerial indifference, and the rates presently charged by it yield a
   return sufficient to pay the interest on its indebtedness and a sub-
   stantial dividend upon its stock, but less than that which would be
   deemed a fair return upon the fair value of its properties were the
   service adequate, the Utilities Commission may lawfully deny it
   authority to increase its rates for such service. G.S. 62-133.

2. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—**
   **purpose of public utility laws**
   The primary purpose of G.S. Chapter 62 is not to guarantee to
   the stockholders of a public utility constant growth in the value of
   and in the dividend yield from their investment, but is to assure the
   public of adequate service at a reasonable charge.

671

3. **Utilities Commission § 6— statutes assuring utility of adequate revenue — purpose**

Provisions of G.S. Chapter 62 designed to assure a public utility of adequate revenues are in the nature of corollaries to the basic proposition that the public is entitled to adequate service at reasonable rates and safeguards against administrative action which would violate constitutional protections by confiscation of the utility's property.

4. **Utilities Commission § 6— rate of return — zone of reasonableness**

For a utility rendering acceptable service, there is a zone of reasonableness extending over a few hundredths of one per cent within which a rate of return fixed by a regulatory commission will not be disturbed by the courts.

5. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— service inadequacies — condition of properties — bad management — consideration of both**

In a telephone rate case, the Utilities Commission did not err in considering service inadequacies due to the condition of the properties in determining fair value and also in considering service inadequacies due to the quality of the management and personnel of the company in determining a fair return upon the fair value of the properties.

6. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— failure to remedy inadequacies of service — denial of rate increase**

Where the Utilities Commission granted a telephone company increases in rates three times in a period of five years notwithstanding its finding of serious inadequacies in the company's service, and the company has indicated that it does not intend to make two of the improvements in service ordered by the Commission unless compelled to do so, the Commission cannot be deemed to have acted arbitrarily in saying that it would permit the company to raise its rates so as to increase its return on the fair value of its properties from 6.65% to at least 8.02% if its service were adequate but it will not now permit such increase in view of the company's persistent disregard of such inadequacy of service.

7. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— excessive prices paid to affiliate — deduction from original cost**

Evidence that in instance after instance a telephone company paid to an affiliated company for equipment and materials prices far in excess of those paid by companies in the Bell System to Western Electric Company for like or superior equipment and materials supported the Utilities Commission's finding that such prices were so excessive as to indicate bad faith or mismanagement by those who control the telephone company, and such finding supported the Commission's deduction from the original cost, and so from the replacement cost and fair value, of the telephone company's properties on account of the excessive prices paid to the affiliated company.

8. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— excessive plant margin — deduction from original cost**

There was sufficient evidence to support the Utilities Commission's deduction from original cost, and so from replacement cost and

Utilities Comm. v. Telephone Co.

· fair value, of the properties of a telephone company because of over-building of plant and the resulting excessive plant margins.

9. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— necessary working capital — administrative question**

The amount of cash working capital reasonably required in a telephone company's operations is an administrative question upon which the Utilities Commission's determination is conclusive.

10. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate case — rates charged by other utilities**

While rates charged by one telephone company do not, per se, constitute a standard by which to determine the reasonableness of those of another company, evidence of comparative rates may have some relevancy for use as a guide to the limits of the zone of reasonableness when the territories served and operating conditions are similar.

11. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— evidence of rates charged by other similar utilities — absence of prejudice**

In a telephone rate case, the Utilities Commission did not commit prejudicial error in the admission of rate tariffs of other telephone companies having similar territories and operating conditions where the order of the Commission does not indicate that it gave any effect to such evidence other than use as a guide to the limits of the zone of reasonableness and it is inconceivable that the order would have been different had such evidence not been introduced.

12. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— rates yielding return below that allowed in prior proceeding**

A telephone company's properties were not confiscated by the Commission's order continuing in effect rates which will yield a rate of return below that determined by the Commission to be reasonable in a prior proceeding, since ·such determinations are not *res judicata* and do not forbid either a higher or lower rate of return in a subsequent proceeding.

13. **Utilities Commission § 6— replacement cost — uncontradicted expert testimony — rejection by Commission**

The Utilities Commission is not required to accept in full the conclusion of an expert witness as to replacement cost, even though it be uncontradicted by other evidence in the record.

14. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rate case — inadequate service due to plant deficiencies — effect on replacement cost — failure to find facts — harmless error**

Failure of the Utilities Commission to find facts with respect to the effect it gave to inadequacy of service due to plant deficiencies in determining replacement cost, and so the fair value, of a telephone company's properties was not prejudicial error where it is apparent that the Commission's denial of the utility's request for an increase in rates was due to a finding of gross inadequacies of service due to management and personnel deficiencies rather than to plant deficiencies, and the effect given by the Commission to inadequacy of

service due to plant deficiencies in determining fair value does not appear to have been large in relation to its finding of fair value.

Chief Justice BOBBITT not sitting.

ON *certiorari* to review the decision of the Court of Appeals, reported in 21 N.C. App. 408, 204 S.E. 2d 529, remanding to the Utilities Commission a general rate case, in which the Utilities Commission denied, in its entirety, the application of General Telephone Company of the Southeast for an increase in its rates.

General Telephone Company of the Southeast, hereinafter called General, is a public utility corporation, supplying telephone service in this and other states. In North Carolina it serves through its Durham, Creedmoor, Monroe, Altan and Goose Creek exchanges. It is a wholly owned subsidiary of General Telephone and Electronics Corporation, hereinafter referred to as GT&E. It purchases the major part of its equipment and supplies from Automatic Electric Company, hereinafter called Automatic, another wholly owned subsidiary of GT&E.

General estimated that the proposed rates and charges would increase its total annual revenue from intrastate service in North Carolina by $2,930,575. The Attorney General, the City of Durham and the Monroe-Union County Chamber of Commerce intervened in opposition to the proposed increases.

The Commission conducted hearings which extended over 15 hearing days. It received from witnesses for General, the protestants and the Commission's staff oral testimony, the narration of which covers more than one thousand pages of the printed record on appeal, plus many voluminous statistical exhibits. Witnesses in opposition to the proposed increases included 89 individual subscribers to General's telephone service, their testimony relating primarily to the quality of the service being rendered.

Pending the hearing and determination of its application, General, pursuant to G.S. 62-135, put the proposed increases into effect, filing with the Commission its undertaking to make refund, with interest, of the additional revenues to the extent that such increases were not finally approved by the Commission.

On 22 October 1973, the Commission, Chairman Wooten dissenting, issued its order denying the application for increased

rates and charges in its entirety and directing General to refund all such collections pursuant to its undertaking. The order of the Commission, covering 78 pages in the printed record on appeal, contains extensive and detailed findings of fact and conclusions of the Commission thereon.

General appealed to the Court of Appeals, making 12 assignments of error presenting, in its view, eight questions of law. Without passing upon these, the Court of Appeals remanded the proceeding to the Commission because of what it deemed a failure by the Commission "to find facts with respect to the effect it gave the factor of inadequate service in reducing the fair value of the properties."

General petitioned for certiorari, seeking the determination by the Supreme Court, prior to the remand to the Commission, of the above mentioned questions of law, which relate to: (1) A deduction from General's net investment in plant in service by reason of alleged excessive prices paid by General to Automatic; (2) a deduction from General's net investment in plant in service by reason of alleged excess plant margins; (3) the Commission's finding that the replacement cost of General's properties is less than that stated by General's expert witness; (4) the Commission's consideration of alleged inadequacy of service both in determining the fair value of General's properties and in determining a just and reasonable rate of return thereon; (5) alleged confiscation of General's properties in that the Commission's order restricts General to a rate of return below the level allowed it by the Commission in an order issued in 1971; (6) the Commission's finding that General was not providing adequate, efficient and reasonable service; (7) the Commission's taking into consideration rates and operating statistics of other telephone companies; and (8) the Commission's computation of General's cash working capital requirement.

The Commission made the following findings of fact (summarized except as indicated by quotation marks):

4. On 11 May 1971, in an earlier proceeding, the Commission ordered General to make specified service improvements. These have not been completed. General's contention that two of them are unreasonable is not supported by the record.

5. Customer complaints in the record show dissatisfaction with direct distance dialing service, local dialing service, billing

matters, the necessity for repeatedly reporting service problems and other aspects of General's service.

6. General's net investment in intrastate utility plant in service, as shown on its books, must be adjusted downward in the amount of $838,448 (after considering accumulated depreciation) by reason of the "excess profits" made by Automatic upon its sales to General. This adjustment "is based on the concept of limiting the earnings of the supplier affiliate to a reasonable rate of return-on-equity. Any rate of return-on-equity to [Automatic] on transfers of equipment and supplies in excess of 15% is unjust and unreasonable."

7. The net original cost of General's North Carolina intrastate utility properties (cost less depreciation reserve), as shown on General's books, is $57,503,365. From this must be subtracted $838,448 because of the excess profits made by Automatic. (See Finding No. 6 above.) A further subtraction of $686,526 (after considering accumulated depreciation) must be made for "excess margin in central office equipment" due to overbuilding of the plant. The net original cost of the properties, so adjusted, is $55,978,391. To this nothing is added for working capital, the reason being that General has the use of customer deposits and funds collected from customers (as part of the rates charged for service) for the purpose of paying General's taxes before such taxes are payable, the total being in excess of General's working capital requirements.

8. General's expert witness on the subject of replacement cost presented a trended original cost study which is "unacceptable as the full basis for determining replacement cost." It does not make any allowance for "inefficiency of excess margin, existing service or plant deficiencies, any advances in the art of telephony which have occurred over the life span of the surviving plant, or adjust for any excess prices paid for installed plant facilities. To the contrary, the result * * * is to compound all of these deficiencies through his trending process." In view of these deficiencies in General's evidence of replacement cost, the Commission "can only approximate the reasonable replacement cost in this docket as being $60,000,000."

9. "The fair value of General's property used and useful in providing service to the public within North Carolina as of the end of the test period is $57,201,810."

10. After appropriate accounting and pro forma adjustments, General's revenue under present rates is $17,474,709 and its operating expenses are $6,641,934, the depreciation and amortization expense is $3,173,763, its taxes other than income are $2,231,327, its State and Federal income taxes are $1,619,695, its interest payable on customer deposits is $4,000, and its net operating income for return is $3,804,990, giving General "a rate of return on adjusted depreciated original cost net investment of 6.84%; a return on original cost common equity of 7.34%; a return on the adjusted fair value rate base of 6.65%; and a return on fair value common equity of 6.90%."

11. After appropriate adjustments, above mentioned, "General's interest coverage before income taxes is 2.77 times."

12. "Assuming adequate service were being provided, a rate of return between 8.02% and 8.24% on the fair value rate base, and a rate of return on General's common book equity in the range of 10.5% to 11.0%, based on test year operations and the present capital structure would represent a fair rate of return on fair value and a reasonable rate of return on the end of test year common equity investment; that the rate of return in the range of 8.02% to 8.24% on the fair value rate base would provide a rate of return in the range of 9.87% to 10.34% on common equity as adjusted for the increment by which fair value exceeds original cost, which would be a reasonable rate of return on said adjusted common equity, if adequate service were being provided."

13. "Because of General's presently inadequate service, a rate return of 6.65% on the fair value rate base is just and reasonable; that said 6.65% rate of return on the fair value rate base will produce a 7.34% rate of return on test period common equity and a rate of return of 6.90% on common equity as adjusted for the fair value increment; and that although the 7.34% rate of return on test period common equity is below the return on common equity which would be found reasonable for this utility equity investment if the service were adequate, the net operating income for return produced by the present rates produce [sic] the rates of return on the fair value rate base and the rates of return on common equity set out above and is sufficient to cover all test year interest charges, preferred dividends, and results in an interest charges coverage of 2.77 times, which will allow General to issue additional bond debt for financing purposes, and based on the present quality of

service, such rates of return are just and reasonable, and telephone rates producing revenues for any higher rate of return on fair value or on common equity would be unjust and unreasonable *at this time*." (Emphasis added.)

14. "That General's inability to earn a better rate of return at its present level of rates and charges has been and continues to be substantially caused by a) its inordinately high plant investment; b) inordinately high maintenance expense; and c) management practices and policies resulting in operating inefficiencies."

15. "That the rate increase proposed in this docket are [sic] unjust and unreasonable, and that General has failed to carry the burden of proof that any rate increase should be allowed *in this Docket*." (Emphasis added.)

Under the caption "CONCLUSIONS" the Commission made the following observations, which are summarized except as indicated by quotation marks:

A. "The level of service now being provided by General to its North Carolina subscribers is not adequate and must be improved with respect to reliability and dependability of service. The Commission concludes that the requirements for specific service improvements set forth in the Commission Orders in Docket No. P-19, Sub 115 [an earlier proceeding] should remain in full force and effect. *General's progress in meeting all service improvement requirements* of orders dated May 11, 1971, and November 14, 1972, *as well as its progress in remedying other subscriber dissatisfactions will be carefully considered in any future proceedings before this Commission.*" (Emphasis added.)

B. Prices charged by Automatic to General have been unreasonably high and excessive to the extent that they produce a rate of return on Automatic's common equity in excess of 15%, making the above adjustment to the rate base on that account appropriate.

C. The above mentioned "excess plant margin" is not "used and useful in providing telephone service in North Carolina," making the above mentioned adjustment to the rate base on that account appropriate.

D. "We find the record to be replete with evidence of poor planning and engineering, biased selection of equipment and

materials, high investment, high expenses, operational ineffi-
ciencies, and chronically poor service. The whole ball of wax
adds up to bad management. * * * For us to allow General to
increase its rates in this docket sufficiently to achieve an ade-
quate or acceptable rate of return as judged by the marketplace,
would of necessity involve our finding and concluding that
General's investment is at reasonable original cost, that its
service is adequate, efficient, economical and reasonable, and
that its management has been sound. This we simply cannot
do. * * * We recognize that many of the shortcomings of Gen-
eral's management are intangible and somewhat difficult to
observe from a written record. However, *the demeanor of
several of the witnesses from the higher levels of management
are [sic] clearly demonstrative of an attitude of a complacement
monopoly.* We conclude that *if all prerequisites were present, a
substantially higher rate of return should and would be al-
lowed, but that in view of the inefficient and inadequate service,
unreasonable levels of investment and expense, and unsound
management, no increase in rates should be allowed herein."*
(Emphasis added.)

   *Robert Morgan, Attorney General, I. Beverly Lake, Jr.,
Deputy Attorney General, and Jerry J. Rutledge, Associate
Attorney, for the Using and Consuming Public.*

   *Edward B. Hipp, Commission Attorney, Maurice W. Horne,
Assistant Commission Attorney, and John R. Molm, Associate
Commission Attorney, for North Carolina Utilities Commission.*

   *Claude V. Jones for the City of Durham, Intervenor.*

   *Ward W. Wueste, Jr.; Newsom, Graham, Strayhorn, Hed-
rick, Murray & Bryson by A. H. Graham, Jr., and K. Byron
McCoy; Power, Jones & Schneider by John Robert Jones and
William R. White for General Telephone Company of the
Southeast.*

   LAKE, Justice.

[1]   The crucial question upon this appeal is: When, upon
substantial evidence, a public utility is found to be rendering
grossly inadequate service, due to bad management and man-
agerial indifference, and the rates presently charged by it yield
a return sufficient to pay the interest on its indebtedness and
a substantial dividend upon its stock, but less than that which
would be deemed a fair return upon the fair value of its prop-

erties were the service adequate, may the Utilities Commission lawfully deny it authority to increase its rates for such service? The answer is yes.

There is ample evidence in the record to support the Commission's findings that General is rendering "chronically poor service" and that this is due to "bad management" and demonstrates "an attitude of a complacement monopoly." Although the company presented evidence to the contrary, these findings of the Commission, being supported by substantial, competent evidence in the record are conclusive. *Utilities Commission v. General Telephone Co.*, 281 N.C. 318, 336, 189 S.E. 2d 705; *Utilities Commission v. Coach Co.*, 269 N.C. 717, 153 S.E. 2d 461; *Utilities Commission v. Telegraph Co.*, 267 N.C. 257, 148 S.E. 2d 100; *Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 130 S.E. 2d 890.

[2, 3] Pursuant to G.S. 62-110, the State, through the Utilities Commission, has granted to General a monopoly upon the business of rendering telephone service to the public within its several service areas in North Carolina. The primary purpose of Chapter 62 of the General Statutes is not to guarantee to the stockholders of a public utility constant growth in the value of and in the dividend yield from their investment, but is to assure the public of adequate service at a reasonable charge. It became evident long ago that the attainment of this primary objective is endangered both by unrestrained competition and by the creation of a "complacent monopoly" in the public utility business. Consequently, Chapter 62 provides for the granting of a monoploy and for the regulation of its service and its charges by the Utilities Commission. The entire chapter is a single, integrated plan. Its several provisions must be construed together so as to accomplish its primary purpose. Its provisions, such as G.S. 62-133, designed to assure the utility of adequate revenues, are in the nature of corollaries to the basic proposition that the public is entitled to adequate service at reasonable rates and safeguards against administrative action which would violate constitutional protections by confiscation of the utility's property. Without such assurance, the owners of capital would not invest it in the utility's bonds or stock and the utility could not provide the plant necessary for the rendering of adequate service.

G.S. 62-133 lays down the procedure by which the Commission is to fix rates which will enable the utility "by sound

management" to pay all of its costs of operation, including maintenance, depreciation and taxes, and have left a fair return upon the fair value of its properties. This, however, must be applied in the light of the provisions of Chapter 62 relating to the duty of the utility to render adequate service. G.S. 62-32(b) provides: "The Commission is hereby vested *with all power necessary* to require and compel any public utility to provide and furnish to the citizens of this State reasonable service of the kind it undertakes to furnish and fix and regulate the reasonable rates and charges to be made for such service." (Emphasis added.) G.S. 62-131 provides: "(a) Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable. (b) Every public utility shall furnish adequate, efficient and reasonable service."

Obviously, it was not the intent of the Legislature to require the Commission to fix rates without any regard to the quality of the service rendered by the utility and thus to assure a "complacent monopoly" a "fair return upon the fair value of its properties," while it persists in rendering mediocre service and turns a deaf ear both to customer complaints and to Commission orders for improvement. On the contrary, the quality of the service rendered is, necessarily, a factor to be considered in fixing the "just and reasonable" rate therefor.

[4] As we said in *Utilities Commission v. General Telephone Co., supra,* at page 370, the rate making procedure prescribed in G.S. 62-133 is designed to yield to the utility a return which will meet the test laid down in *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176. In that case the Supreme Court of the United States gave more precise meaning to the constitutional requirement of a "fair return on fair value," declared by it in *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819. The quality of the utility's service was not in question. The Bluefield test assumes reasonably good service. Since the rate of return on the fair value of its properties which will enable a utility company to attract the capital it needs (the essence of the Bluefield test) cannot be pinpointed with absolute accuracy, it is universally recognized that, for a utility rendering acceptable service, there is a zone of reasonableness extending over a few hundredths of one per cent, within which a rate of return fixed by a regulatory commission will not be disturbed by the courts.

General contends that, however poor may be its service, a utility has a constitutional right to charge therefor rates which will enable it to earn upon the fair value of its properties a return not less than the lower limit of this zone of reasonableness. No decision of this Court so holds. Neither the Bluefield case, *supra*, *Smyth v. Ames*, *supra*, nor any other decision of the Supreme Court of the United States which has been brought to our attention gives support to this contention. Neither of those cases dealt with a utility which was rendering a grossly inadequate service. In *Smyth v. Ames*, *supra*, at page 545, the Court quoted with approval *Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 596-7, 17 S.Ct. 198, 41 L.Ed. 560, as follows:

> "It cannot be said that a corporation is entitled as of right, and without reference to the interests of the public, to realize a given per cent upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. * * * The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends. * * * So that the right of the public to use the defendant's turnpike upon payment of such tolls as in view of the nature and value of the service rendered by the company are reasonable, is an element in the general inquiry whether the rates established by law are unjust and unreasonable."

In *Utilities Commission v. Morgan, Attorney General*, 277 N.C. 255, 177 S.E. 2d 405, the appellant utility made the same contention now made by General; that is, that the Utilities Commission could not lawfully refuse to approve rates which would yield the utility a fair return on the fair value of its properties, regardless of the quality of its service. We said (at page 266):

> "It is not reasonable to construe G.S. 62-133 (b) to require the Commission to shut its eyes to 'poor' and 'substandard' service resulting from a company's wilful, or negligent, failure to maintain its properties or to heed com-

plaints from its subscribers when the Commission is called upon by the company to permit it to increase its rates for its inadequate service. We reject the contention of the company upon this question."

We adhere to that construction of G.S. 62-133.

In the present case, we do not reach the question of the authority of the Commission to fix rates at a confiscatory level as a penalty for inadequate service. The Commission found that the existing rates for service, which the order continued in effect, were sufficient, after payment of all expenses, including maintenance, depreciation and taxes, to yield to General a return of 6.65% on the fair value of its properties. This finding is not challenged. Schedule II of Exhibit 1, introduced by the Commission's staff, shows that, during the twelve-month test period, the rates produced net operating income for return of $3,778,527 from North Carolina intrastate service, a figure slightly less than that found by the Commission. After paying all interest on General's indebtedness, taxes and the dividends on the portion of its preferred stock allocable to North Carolina intrastate service, this left $1,740,282 for the common stockholders. This was sufficient to pay a 6% dividend on the portion of the common stock allocable to North Carolina intrastate service and still leave for addition to surplus $359,770. The staff's computation of results achieved during the test period does not include any adjustment for excessive profits paid by General to Automatic for materials and supplies purchased by General during the test period. This is not confiscation. See: *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151, 163-164, 54 S.Ct. 658, 78 L.Ed. 1182.

[5] General contends that it has been penalized twice for poor service in that the Commission, in its computation of the fair value of General's property, considered "the inadequacy of telephone service provided by the plant." There is no merit in this contention. As we said on the previous appeal of this company *(Utilities Commission v. General Telephone Co., supra,* at page 361), "It is obvious that consistently poor service, *attributable to defective or inadequate or poorly designed equipment or construction,* justifies a subtraction from both the original cost and the reproduction cost of the existing plant before weighing these factors in ascertaining the present 'fair value' of the properties." (Emphasis added.) To the same effect is *Utilities Commission v. Morgan, supra.* This is not the imposi-

tion of a penalty. It is merely the consideration of a factor in the computation of the "fair value" of the properties.

Inadequacy of service due, not to the condition of the properties but to inefficient personnel, bad management and the indifference of a "complacent monopoly" is an entirely different matter. This does not relate to the value of the properties. But it does relate to the value of the service and to the reasonableness of the rates proposed to be charged therefor. The record now before us contains ample evidence to support the Commission's findings of service inadequacies due to the condition of the properties and others due to the quality of the management and personnel of this company.

In 1968, General applied to the Commission for an increase in rates. The Commission granted an increase but warned General that its service was inadequate and must be improved. In 1971, General again applied for an increase in rates. Again, the Commission allowed a part of the requested increase but found the service inadequate and specified eleven respects in which it must be improved promptly. On appeal this order was remanded to the Commission for further consideration. See: *Utilities Commission v. General Telephone Co., supra.* On remand the Commission again allowed a portion of the requested increase and reaffirmed its orders requiring improvement in service. General did not appeal from the portion of the Commission's original order relating to service improvements and did not appeal from any portion of its order on remand. In the present case, the Commission found that two of the previously ordered improvements in service have not been made. General contended before the Commission that these two improvements are "unreasonable," thus clearly indicating that it does not intend to make them unless compelled to do so.

[6]    Thus, three times in a period of five years the Commission has granted General increases in rates, notwithstanding its finding of serious inadequacies in General's service. This was within the administrative discretion of the Commission. *Utilities Commission v. Morgan, supra,* at page 266. Having labored patiently with General in an effort to induce it to improve its service by allowing it rate increases, the Commission cannot be deemed to have acted arbitrarily in saying, as it has now done, that it would permit General to raise its rates so as to increase its return on the fair value of its properties from 6.65% to at least 8.02% if its service were adequate but it will

not now permit such increase in view of General's persistent disregard of such inadequacy of service. See: *D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,* 466 F. 2d 394, 407, 418 (cert. den. 409 U.S. 1086) ; *United Telephone Co. of Florida v. Mayo (Fla.),* 215 So. 2d 609 (app. dism. 394 U.S. 995).

To remove inadequacies of service resulting from the indifference of top level management and from incompetence or indifference of operating personnel does not require the attraction of additional capital. It does not require time consuming construction programs or the acquisition of equipment. These circumstances distinguish the present case from *Elyria Telephone Co. v. Public Utilities Commission,* 158 Ohio St. 441, 110 N.E. 2d 59, and *General Telephone Co. v. Michigan Public Service Commission,* 341 Mich. 620, 67 N.W. 2d 882, which approved and followed the Elyria case. In *Village of Apple River v. Illinois Commerce Commission,* 18 Ill. 2d 518, 165 N.E. 2d 329, also relied upon by General, the Supreme Court of Illinois reversed the decision of the lower court, which had held that the Commission did not have administrative discretion to allow a rate increase where the service was inadequate. This reversal is in accord with our holding in *Utilities Commission v. Morgan, supra.* In the present case, General is faced with no emergency or sudden demand for improved service.

[7] The remaining questions raised by General in this appeal do not require extended discussion. The principles of law governing the authority of the Commission to make a deduction from the original cost, and so from the replacement cost and the fair value, of the properties of General on account of excessive prices paid to Automatic for equipment and materials are set forth in *Utilities Commission v. General Telephone Co., supra,* at pages 341 to 348, and need not be repeated here. See also: *Utilities Commission v. Morgan, Attorney General, supra,* at pages 270 to 273.

In the former General Telephone case, we concluded that the evidence in the record did not support the finding that the prices charged by Automatic to General were so excessive as to indicate bad faith or mismanagement by those who control General. In the present record, there is evidence sufficient to support the Commission's finding in this respect. This evidence is to the effect that, in instance after instance, General paid to Automatic for equipment and materials prices far in excess of

those paid by operating companies in the Bell System to Western Electric Company for like or superior equipment and materials. This evidence was not introduced by the Commission's staff, or considered by the Commission, as evidence that General could have purchased its equipment and materials more cheaply from Western Electric. Western Electric sells only to the Bell System operating companies, with exceptions not here material. The significance of this evidence is that it affords basis for a finding that GT&E has consistently used its complete control over its two subsidiaries so as to cause General to pay excessive prices to Automatic, thus decreasing General's rate of return while increasing the profits of its only stockholder.

Neither in sales by Automatic to General nor by Western Electric to the Bell System operating companies is there bargaining between seller and purchaser at arm's length. Judicial notice may be taken, however, of the well known fact that Western Electric is not operated as an eleemosynary institution but is a significant source of the overall profit of the Bell System. The evidence of the prices charged by it to its affiliates is relevant in determining the reasonableness of prices charged by Automatic to General.

[8] The principles of law governing the authority of the Commission to make a deduction from original cost, and so from replacement cost and fair value, of the properties of General because of the overbuilding of the plant and the resulting excessive plant margins are also set forth in *Utilities Commission v. General Telephone Co., supra,* at pages 351 to 355, and need not be repeated. While, in the present case, the company offered substantial evidence to show that there was no significant excess plant margin, this conflict of evidence presented a question of fact upon which the finding of the Commission is conclusive and may not be disturbed by the reviewing court, even though the court might have reached a different conclusion thereon. *Utilities Commission v. Telephone Co., supra,* at page 336, and cases therein cited.

[9] There was no error in the Commission's finding as to the cash working capital requirements of General, based upon the Commission's long established formula for making that determination, notwithstanding evidence by a witness for General that a lead-lag study made by him led him to the conclusion that a larger allowance was appropriate. The lead-lag study, itself, was not introduced in evidence. The credibility of the evidence

was for the Commission, and the amount of cash working capital reasonably required in the company's operations is an administrative question upon which the Commission's determination is conclusive. *Utilities Commission v. Virginia Electric and Power Co.*, 285 N.C. 398, 415, 206 S.E. 2d 283.

The City of Durham, a party protestant, introduced as exhibits rate tariffs of Southern Bell Telephone & Telegraph Company, Carolina Telephone & Telegraph Company, General Telephone Company of Kentucky, United Telephone Company of Ohio and Rochester Telephone Company. General assigns the admission of this evidence as error, for the reason that there was no showing of comparable operating conditions. On the contrary, there was testimony by the Commission's staff engineers as to similarity of territories and operating conditions as between General, on the one hand, and Southern Bell Telephone & Telegraph Company and Carolina Telephone & Telegraph Company, on the other. General, itself, through its expert witness on the question of rate of return, offered testimony and exhibits as to the earnings of the other three companies, the witness testifying that they are comparable in size and investor risk to General.

[10, 11] Obviously, rates charged by one telephone company do not, per se, constitute a standard by which to determine the reasonableness of those of another company, even when the territories served and operating conditions are similar. The probative value of such evidence is slight at best, but where, as here, there is evidence of substantial similarity of conditions, evidence of comparative rates may have some relevancy for use as a guide to the limits of the zone of reasonableness. The order of the Commission does not indicate that it gave any other effect to this evidence and it is inconceivable that the order would have been different in any way whatever had this evidence not been introduced. The statute requires the reviewing court to take due note of the rule of prejudicial error. G.S. 62-94(c).

[12] There is no merit in General's contention that its properties have been confiscated in that the rates continued in effect by the Commission's order will yield a rate of return below that determined by the Commission to be reasonable in its 1971 order. Such determinations are not *res judicata* and do not forbid an allowance of either a higher or a lower rate of return in a subsequent proceeding. G.S. 62-133(e).

[13]   The Commission did not exceed its authority in finding the replacement cost of General's properties to be less than that stated by General's expert witness, even though there was no other testimony on the question of replacement cost. The credibility of the testimony was for the determination of the Commission. *Utilities Commission v. Virginia Electric and Power Co., supra,* at page 409. In this instance, it found the conclusion of the witness unacceptable, to a degree, by reason of specified deficiencies in his method of computation. The Commission is not required to accept in full the conclusion of an expert witness as to replacement cost, even though it be uncontradicted by other evidence in the record. *Utilities Commission v. Duke Power Co.,* 285 N.C. 377, 390, 206 S.E. 2d 269; *Utilities Commission v. General Telephone Co., supra,* at page 360-361.

[14]   The Court of Appeals adjudged that the proceeding should be remanded to the Commission because the Commission failed "to find facts with respect to the effect it gave the factor of inadequate service in reducing the fair value of the properties." This the Commission should have done. *Utilities Commission v. General Telephone Co., supra,* at page 361. However, under the circumstances of this case, this was harmless error and not ground for such remand. G.S. 62-94(c).

The effect given by the Commission to inadequacy of service due to management is shown clearly and precisely. It is apparent from consideration of the order of the Commission, in its entirety, that the denial of the request for an increase in rates for service was due to the Commission's finding of gross inadequacies of service due to management and personnel deficiencies rather than to plant deficiencies. The effect given by the Commission to inadequacy of service due to plant deficiencies in determining the replacement cost, and so the fair value, of the properties of General does not appear to have been large in relation to its finding of fair value. This was but one of several matters considered by the Commission in refusing to accept at face value the company's evidence of replacement cost.

Under the circumstances of this case, it appears that no useful purpose would be served by a remanding to the Commission for the further finding directed by the Court of Appeals. Such remand would only delay the final determination of the present proceeding. Nothing in the order of the Commission precludes General from filing, at a time selected by it, a new

proceeding with the Commission and establishing therein that it has removed the cause of the service inadequacies which, in the present proceeding, caused the Commission to deny its application. The order from which General now appeals shows clearly that such a course would result in the allowance of a higher rate of return.

The judgment of the Court of Appeals remanding this proceeding to the Utilities Commission is, therefore, reversed and the matter is remanded to the Court of Appeals for the entry of a judgment by it affirming the order of the Commission.

Reversed and remanded.

Chief Justice BOBBITT not sitting.