385 S.E.2d 463 (1989)
325 N.C. 484
STATE of North Carolina ex rel. UTILITIES COMMISSION; Carolina Utility Customers Association, Inc., Intervenor; Carolina Industrial Group for Fair Utility Rates (Cigfur-II), Intervenor; North Carolina Electric Membership Corporation, Intervenor; United States Secretary of the Navy, Intervenor; Elizabeth Anne Cullington, Intervenor; and North Carolina Fair Share, Intervenor, Appellees,
v.
Lacy H. THORNBURG, Attorney General, Intervenor; Carolina Power & Light Company, Applicant, and
Public StaffNorth Carolina Utilities Commission, Intervenor.
No. 89A89.
Supreme Court of North Carolina.
November 9, 1989.
James D. Little and David T. Drooz, Raleigh, for Public StaffNorth Carolina Utilities Com'n, cross-appellant.
Lacy H. Thornburg, Atty. Gen. by Jo Anne Sanford, Sp. Deputy Atty. Gen., Karen E. Long and Lemuel W. Hinton, Asst. Attys. Gen., Raleigh, for Attorney General, appellant.
Richard E. Jones, Vice President and Gen. Counsel and Robert S. Gillam, Associate *464 Gen. Counsel, Raleigh, for Carolina Power and Light Co., appellant.
FRYE, Justice.
This is a general rate case in which CP & L sought to include in the rate base the full costs of the Shearon Harris Nuclear Power Plant (Harris Plant), which became operational in May, 1987. Approximately $570,000,000 of the total costs of constructing Unit 1 was quantified as the cost of constructing common facilities to service abandoned Units 2, 3, and 4.
The essential questions presented for our review are whether the Commission erred in allowing CP & L to include in its rate base costs of $389,442,000 of the approximately $570,000,000 invested in plant facilities to service abandoned Units 2, 3, and 4 and in allowing CP & L to amortize the remaining $180,558,000 as cancellation costs. In order to answer these questions, we must examine two statutes, N.C.G.S. § 62-94, which establishes the standard of review for an appeal from a decision by the Commission, and N.C.G.S. § 62-133, which sets out the rate making process for the Commission to follow when deciding a general rate case. We hold that the orders of the Commission were affected by an error of law, N.C.G.S. § 62-94(b)(4), requiring that this case be remanded to the Commission with instructions to remove approximately $389,000,000 from the rate base and include it with the approximately $181,000,000 to be treated as cancellation costs because the former amount was not spent for property that is "used and useful" in providing electric service to the consumers as required for inclusion in the rate base under N.C.G.S. § 62-133(b)(1). Our decision further requires that the Commission on remand determine whether a new rate of return must be fixed in accordance with N.C.G.S. § 62-133(b)(4) in order that the rates fixed by the Commission shall, pursuant to N.C.G.S. § 62-133(a), be fair to CP & L and to the consumer.

I.
On 10 September 1987 CP & L filed an application with the Commission for a rate increase which would include the full construction costs of the Harris Plant. The Commission entered an order on 9 October 1987 declaring the application a general rate case. Eight parties were allowed to intervene. They were: the Public Staff, the North Carolina Department of Justice, the United States Department of Defense, Carolina Utility Customers Association, Inc., Carolina Industrial Group for Fair Utility Rates, the North Carolina Electric Membership Corporation, North Carolina Fair Share, and Elizabeth Anne Cullington. Hearings were held in Goldsboro, Wilmington, Asheville, and Raleigh during March and April of 1988. Seventy-five witnesses testified at these hearings. Further hearings were held in Raleigh from 14 April 1988 to 16 June 1988. Six of the eight intervening parties introduced testimony from twenty-one expert witnesses and six industrial consumers.
When the Harris Plant was originally designed in 1971, it included four nuclear generating units with one unit scheduled to be brought on line each year from 1977 through 1980. CP & L based its plans for this plant on projected growth rates which would require construction of all four nuclear generating units at the Harris Plant to meet the projected electric needs of its customers. However, the 1973 OPEC oil embargo changed the projected demands for electricity. New studies showed that CP & L would not need the four units originally planned for the Harris Plant. Therefore, CP & L decided to cancel the plans for Units 2, 3, and 4.
The initial cost estimate to build Harris Unit 1 was approximately $315,000,000. Harris Unit 1 actually came into commercial operation in 1987 at a cost of approximately $3,900,000,000. The original plans for the Harris Plant, adopted in 1971, called for a cluster design with the four units sharing certain common plant facilities such as the fuel handling building and waste processing building. The purpose of the cluster design was to save money overall by sharing common facilities rather than building these facilities separately for each unit. However, with the cluster design, *465 the first unit built would be more costly than follow-up units because certain structures and systems needed to operate the first unit are sized to be shared with the other units. Since construction on Unit 1 was begun before the other units were cancelled and because the original cluster design was not altered, these common facilities were built to service Unit 1 alone. Thus, the support facilities for Unit 1 were larger than necessary to serve that single unit since they were built to serve all four units.
As a result of the delays and cost overruns on Harris, the Public Staff filed a motion requesting a prudence audit of the plant's construction costs. The Commission issued an order suggesting that the Public Staff oversee such an audit. The Public Staff hired Canatom, Inc., an international engineering and consulting firm with extensive experience in nuclear power plant implementation, to investigate the reasonableness of management decisions and costs related to Unit 1. Canatom spent a year conducting this study and presented its findings in a three-volume report. This report was filed with the Commission in this rate case.
The only part of Canatom's report which is of concern on this appeal is its finding of imprudence on the part of CP & L on the "redesign" issue. Canatom's report indicates that CP & L itself conducted a study to estimate the cost impact of shared or common facilities on Harris Unit 1 due to the original four unit design. The CP & L study quantified approximately $570,000,000 as the value of the additional burden assumed by Unit 1 in anticipation of reducing the costs of the remaining three units which were later cancelled. Canatom reported that $180,558,000 of this amount could have been saved if CP & L had abandoned the cluster design in 1975 and implemented a different design. Canatom concluded that the failure to redesign in 1975 constituted imprudence on the part of CP & L.
In its Order Granting Partial Increase in Rates and Charges filed on 5 August 1988, the Commission made certain findings of fact. Among these findings were:
7. CP & L has met the prudence standard in its financing of the Shearon Harris plant. CP & L's financial management practices relating to Shearon Harris were generally reasonable and efficient.
8. Except as hereinafter found and discussed, the costs of the Shearon Harris nuclear plant are reasonable and were prudently incurred.
....
11. CP & L should be allowed to recover as an expense its abandonment loss sustained as a result of the Company's having cancelled and abandoned its Mayo Unit No. 2 in March 1987. Recovery of the investment in that unit should be accomplished over a ten-year amortization period. CP & L should be allowed to continue to recover the cancellation costs of Harris Units 2, 3, and 4. Costs of $180,558,000 ($98,340,000 on a North Carolina retail jurisdictional basis) proposed for inclusion in rate base as part of Harris Unit 1 should be reallocated and assigned as cancellation costs of Harris Units 2, 3, and 4; these costs should be excluded from rate base and should be treated in a manner consistent with the other CP & L cancellation costs discussed herein.
....
17. CP & L's reasonable original cost rate base used and useful in providing service to its North Carolina retail customers is $3,677,225,000, consisting of electric plant in service of $4,869,311,000, net nuclear fuel investment of $133,271,000, and an allowance for working capital of $114,033,000, reduced by accumulated depreciation of $949,412,000 and accumulated deferred income taxes of $489,978,000.
Commissioner Ruth Cook dissented from the part of the Commission's Order which allowed CP & L to amortize the $180,558,000 over a ten-year period. In her dissent, she concluded that this amount should be classified as "excess plant or plant held for future use" rather than cancellation costs.
*466 Both the Public Staff and the Attorney General made motions for reconsideration by the Commission, and these motions were denied in an Order Denying Motions for Reconsideration filed on 1 September 1988. In this order, the Commission again restated its position that CP & L's decision to use the cluster design, which resulted in the building of excess facilities at a cost of $570,000,000, was prudent. The Commission further explained its decision to divide this amount into $389,442,000 which would be included in the rate base and $180,558,000 which would be treated as cancellation costs. The Commission noted, "this was a ratemaking adjustment that was, in effect, adopted by the Commission on its own motion since no party to this proceeding proposed such an adjustment. We adopted this treatment for reasons of fairness and equity."
The Attorney General, the Public Staff, and CP & L all appealed from the Commission's order of 5 August 1988. Only the Attorney General and the Public Staff appealed from the order denying reconsideration. The Attorney General contends that the Commission erred in concluding that CP & L's choice of a cluster design in 1971 was prudent. We find no error in this portion of the Commission's order. The Public Staff contends that the Commission erred in quantifying the cancellation costs for common facilities built to serve Harris Units 2, 3, and 4 at $180,558,000 instead of $570,000,000. We agree. CP & L contends that the entire $570,000,000 should be included in the rate base because the Commission found that these expenses were prudently incurred. We do not agree with CP & L's position on this issue.

II.
The Utilities Commission is charged with the duty of "fixing such rates as shall be fair both to the public utility and to the consumer." N.C.G.S. § 62-133 (Cum.Supp. 1988). Section 62-133 provides a step-by-step procedure for the Commission to follow in fixing these rates. We reviewed the public utility ratemaking formula in Utilities Comm. v. Thornburg, 325 N.C. 463, 385 S.E.2d 451 (1989) (Thornburg II).
This statute requires the Commission to determine the utility's rate base (RB), its reasonable operating expenses (OE), and a fair rate of return on the company's capital investment (RR). These three components are then combined according to a formula which can be expressed as follows:
(RB × RR) + OE = REVENUE REQUIREMENTS
The rate base is the reasonable cost of the utility's property which is used and useful in providing service to the public, minus accumulated depreciation, and plus the reasonable cost of the investment in construction work in progress. See N.C.G.S. § 62-133(b)(4) (Cum.Supp. 1988 & 1982 Repl.Vol.); C.F. Phillips, Jr., The Regulation of Public Utilities 332 (1984). Operating expenses generally include costs for fuel, wages and salaries, and maintenance, as well as annual depreciation charges and taxes. C.F. Phillips, Jr., The Regulation of Public Utilities 229 (1984). The rate of return is a percentage multiplier applied to the rate base to produce the amount of money the Commission concludes should be earned by the utility, over and above its reasonable operating expenses. See N.C.G.S. § 62-133(b)(4) (Cum.Supp.1988 & 1982 Repl.Vol.).
325 N.C. 463 at 467 n. 2, 385 S.E.2d at 453 n. 2.
In this portion of the appeal, we are concerned with the procedure for determining what goes into the rate base. In determining what goes into the rate base, the statute directs the Commission to
(1) Ascertain the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within the State....
N.C.G.S. § 62-133(b)(1) (Cum.Supp.1988).
The statute sets out a two-part test for the Commission to use in deciding what goes into the rate base for all costs except costs of construction work in progress. *467 The Commission must: (1) determine the reasonable original cost of the property and (2) determine if the property is "used and useful, or to be used and useful within a reasonable time after the test period." Id. If the costs in question do not meet both parts of the test, the costs may not be included in the rate base for rate making purposes. See id.; N.C.G.S. § 62-133(b)(4) and (5).
In contending that the Commission erred in its finding, the Attorney General argues CP & L's decision to use the cluster design was not prudent and does not meet the first part of the test and, therefore, none of the $570,000,000 can be included in rate base. While we agree with the Attorney General's conclusion that the approximately $570,000,000 cannot be included in rate base, we do so, not on the basis of the reasonableness of the costs, i.e., prudence, but on the basis that the property does not meet the second part of the test, i.e., the "used and useful" test.
The standard of review by this Court of an order of the Utilities Commission is set out in N.C.G.S. § 62-94. Under this standard, the reviewing court
shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
(1) In violation of constitutional provisions, or
(2) In excess of statutory authority or jurisdiction of the Commission, or
(3) Made upon unlawful proceedings, or
(4) Affected by other errors of law, or
(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
(6) Arbitrary or capricious.
(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error.
N.C.G.S. § 62-94(b) and (c) (1982 Repl. Vol.). As this Court has often stated, our "statutory function is to assess whether the Commission's order is affected by errors of law, and to determine whether there is substantial evidence, in view of the entire record, to support the position adopted." State ex rel. Utilities Comm. v. N.C. Natural Gas Corp., 323 N.C. 630, 639, 375 S.E.2d 147, 152 (1989); accord State ex rel. Utilities Comm. v. Public Staff, 323 N.C. 481, 489, 374 S.E.2d 361, 365-66 (1988); State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc., 323 N.C. 238, 243-44, 372 S.E.2d 692, 695 (1988); State ex rel. Utilities Comm. v. Eddleman, 320 N.C. 344, at 355, 358 S.E.2d 339 at 347 (1987); State ex rel. Utilities Comm. v. Thornburg, Atty. Gen., 316 N.C. 238, 242, 342 S.E.2d 28, 31-32 (1986); State ex rel. Utilities Commission v. Carolina Utilities Customers Assoc., 314 N.C. 171, 179-80, 333 S.E.2d 259, 265 (1985). We will not disturb the findings of fact of the Commission as long as they are supported by competent, material, and substantial evidence in view of the whole record and are not arbitrary or capricious. Utilities Commission v. Thornburg, 314 N.C. 509, 511, 334 S.E.2d 772, 773 (1985) (Thornburg I).
The Attorney General contends that the Commission's finding of prudence on the part of CP & L violates subsections (4), (5), and (6) of N.C.G.S. § 62-94(b). The Attorney General claims that the Commission did not consider uncontested evidence in the whole record which indicated that CP & L's circumstances and problems in 1971 should have prevented it from selecting the cluster design because it was a high risk choice. We conclude that the Commission's finding that CP & L's costs in building the Harris Plant were prudently incurred is supported by competent, material, and substantial evidence in view of the *468 whole record and is not arbitrary or capricious. In its discussion found in the Order of 5 August 1988 under Evidence and Conclusions For Finding of Fact No. 8, the Commission discusses its finding that selection of the cluster design in 1971 was prudent. In support of this finding, the Commission states:
CP & L's choice of the cluster design was a prudent decision. CP & L considered a number of different alternative plant layouts and eventually selected the cluster design. The Company's decision to use the cluster design was based on specific and identified design criteria. The cluster design did meet the specific and identified design criteria. The cluster design did meet the specific design criteria better than the alternatives. These design criteria were consistent with the Company's long held philosophy of using common facilities at its plants in order to reduce material quantities, construction duration capital costs and total life cycle costs of its plants.
In discussing the Attorney General's contention that choice of the cluster design was not prudent, the Commission states,
the Attorney General's proposed disallowance of $560 million on this issue is premised on the assumption that the only prudent choice in 1971 was the slide-along arrangement. In cross-examination, however, Attorney General witness Marvetich refused to take a position on the prudence of selecting a twin-unit design in 1971. Evidence in this case indicates that CP & L would have selected the twin unit as its second choice, and the twin unit also would have caused the construction of common facilities for one unit.
The Commission further explains its finding that the choice of the cluster design was prudent: "The testimony of Canatom and CP & L Direct Panels, I, II, IV, CP & L Rebuttal Panel II, and CP & L Rebuttal witnesses Reinsch and Boyd are more than ample to support the finding that the choice of the cluster design was prudent." While contrary evidence was presented, the record contains sufficient evidence to support the Commission's finding that CP & L's choice of the cluster design was prudent, and this finding will not be disturbed on appeal. See Thornburg I, 314 N.C. at 511, 334 S.E.2d at 773.

III.
The Public Staff contends that the Commission erred in allowing $389,442,000 in the rate base rather than including this amount with the $180,558,000 which the Commission treated as cancellation costs. As stated earlier, to be included in the rate base, the cost must be both reasonable and incurred for property that is "used and useful" in providing service to the customers. N.C.G.S. § 62-133(b)(1). The public staff contends that the amounts in controversy cannot be included in the rate base because they were not incurred for property that is "used and useful." CP & L contends that the costs were prudently incurred for property that is "used and useful" and that the Commission, in Finding of Fact No. 17, implicitly, if not specifically, found this to be true.
A fair reading of the Commission's Finding of Fact No. 17, quoted in full earlier in this opinion, would indicate that the Commission found that $389,442,000 of the $570,000,000 construction costs was incurred for property that was "used and useful" in providing electric service to its customers as is required by N.C.G.S. § 62-133(b)(1).[1] However, in reading the Evidence and Conclusions For Finding Of Fact No. 11 and the Order Denying Motions For Reconsideration, we find that the evidence showed and the Commission actually *469 found that the $570,000,000 figure represented costs of construction of excess common facilities. In the Evidence and Conclusions For Finding Of Fact No. 11, the Commission stated:
Nevertheless, the Commission further concludes that CP & L's utilization of the cluster design, while prudent in 1971 and 1974 and thereafter, has in fact resulted in the construction of excess common facilities at the Harris Plant in the fuel handling building, the waste processing building, the water treatment building, and the diesel generator and fuel oil tank building. These buildings were designed and built to serve four nuclear units. (Emphasis added.)
In its Order Denying Motions For Reconsideration, the Commission was even clearer that the total cost for the excess common facilities was the $570,000,000 figure. In that Order, the Commission quotes from the Canatom Report:
CP & L conducted a study to estimate the cost impact of shared common facilities on Harris Unit I due to the original four unit design. Specifically, the study sought to arrive at a value for the additional burden assumed by Unit 1 (the common facilities burden) in anticipation of reducing the costs of the follow-on units. This cost has been determined to be approximately $570,000,000. (Emphasis added.)
The Commission then goes further to state:
While the Commission clearly recognized the extent of CP & L's total investment in common facilities to serve Harris Units 2, 3, and 4 as reflected in the Canatom Report and Witness Schlissel's testimony, we decided that it was appropriate to treat only a "reasonable portion" of the Company's total investment in those common facilities as cancellation costs. The intent of our decision was to arrive at an "equitable sharing" of the costs of common facilities between CP & L's shareholders and its North Carolina retail ratepayers. (Emphasis added.)
While the Commission's findings of fact are conclusive when supported by "competent, material, and substantial evidence," Utilities Commission v. Telephone Co., 281 N.C. 318, 336, 189 S.E.2d 705, 717 (1972) (General I), all the evidence in this case tends to show that the $570,000,000 was spent to build excess common facilities. If the facilities are excess, as a matter of law, they can not be considered "used and useful" as that term is used in N.C.G.S. § 62-133(b)(1). See, e.g., General I, 281 N.C. at 351, 189 S.E.2d at 729. Since the excess common facilities are not "used and useful", they cannot be included in the rate base. N.C.G.S. § 62-133(b)(1). The Commission committed an error of law in including $389,442,000 in the rate base because this amount was part of the $570,000,000 used to construct the excess common facilities to serve abandoned Harris Units 2, 3, and 4.

IV.
Since the Commission erred in placing $389,442,000 in the rate base, the next question we must answer is the proper treatment of this amount. The $389,442,000 figure is part of the $570,000,000 figure which was given as the value of the additional burden assumed by Unit 1 in anticipation of building Harris Units 2, 3, and 4. After removing the $389,442,000 from the $570,000,000, the Commission majority classified the remaining $180,558,000 as cancellation costs.
As we have already discussed, the Commission found that the entire $570,000,000 spent to build this excess facility was prudently incurred. We have also held that the excess common facilities cannot be considered "used and useful" so as to be included in rate base. The Public Staff argues that the entire $570,000,000 should be included in the cancellation costs of the abandoned Units 2, 3, and 4. We agree.
The Attorney General contends that the Commission has acted in an arbitrary and capricious manner by classifying the $180,558,000 figure as an abandonment loss subject to amortization as operating expenses. The Attorney General argues that the Commission acted in excess of its statutory authority to find that the $180,558,000 is excess common facilities and then to classify *470 it as abandonment loss. The Attorney General cites General I, 281 N.C. 318, 189 S.E.2d 705; State ex rel. Utilities Commission v. Mebane Home Telephone Company, 298 N.C. 162, 257 S.E.2d 623 (1979); and State ex rel. Commission v. General Telephone Company, 285 N.C. 671, 208 S.E.2d 681 (1974) (General II), for the proposition that excess capacity cannot statutorily be charged to ratepayers. The Attorney General reads these cases too broadly. They do not hold that costs incurred for excess capacity cannot be recovered in ratesonly that such costs may not be charged to ratepayers by including them in the rate base upon which the utility is permitted to earn a return on its investment.
These three cases cited by the Attorney General all address the issue of what should go into rate base. General I, for example, discusses among other issues the Commission's treatment of excess central office equipment which the company purchased. The Court clearly states that the money spent on these excess purchases could not be considered used and useful and, therefore, could not be placed into rate base. General I, 281 N.C. at 355, 189 S.E.2d at 728. We have already decided that the approximately $570,000,000 used to build the excess common facilities may not properly be included in rate base. The question before us is how to classify these costs since they are not properly included in the rate base. None of these cases cited by the Attorney General addresses the issue of the proper treatment of these costs if they are not to be included in the rate base.
In Thornburg II, we held that the Commission did not err in authorizing CP & L to continue to recover a portion of cancellation costs of the abandoned Harris Plant as operating expenses through amortization. Thornburg II, 325 N.C. at 472, 385 S.E.2d at 456. In that case, CP & L argued that it was proper for the Commission to authorize inclusion of the cancellation costs as an operating expense since CP & L's decision to construct the Harris Plant and the decision to cancel Units 2, 3, and 4 were approved by the Commission. We held that the recovery of these costs through the operating expense component was, like the recovery of exploration costs in Utilities Commission v. Edmisten, Attorney General, 294 N.C. 598, 242 S.E.2d 862 (1978), consistent with the purpose of the Public Utilities Act as set forth in N.C.G.S. § 62-2. Here the Commission concluded that CP & L's utilization of the cluster design resulting in excess common facilities was prudent in 1971, in 1974, and thereafter. It further found that "the additional burden assumed by Unit 1 (the common facilities burden) in anticipation of reducing the costs of the follow-on units" was "approximately $570,000,000." The Commission also "clearly recognized the extent of CP & L's total investment in common facilities to serve Harris Units 2, 3, and 4 as reflected in the Canatom report and Witness Schlissel's testimony," but decided "that it was appropriate to treat only a `reasonable portion' of the company's total investment in those common facilities as cancellation costs." A fair reading of the Commission's findings and conclusions is that the $570,000,000 represents cancellation costs attributable to abandoned Harris Units 2, 3, and 4. This is in essence the same as the cancellation costs held to be appropriately amortized as operating expenses in Thornburg II. Therefore, the Commission should have treated approximately $570,000,000[2] as cancellation costs of abandoned Harris Units 2, 3, and 4 to be recovered as operating expenses through amortization. See Thornburg II, 325 N.C. 463, 385 S.E.2d 451.
Our decision concluding that these costs are correctly treated as cancellation costs of abandoned units finds support in a 1983 U.S. Department of Energy study entitled Nuclear Plant Cancellations: Causes, Costs, and Consequences, cited by the Commission in its order in the instant case. In that publication, abandonment costs are *471 defined as "the total cost recognized by traditional utility accounting practices which would have been avoided if the project had never been undertaken." A fair reading of the findings and conclusions of the Commission in this case makes it clear that if Harris Units 2, 3, and 4 had never been undertaken, CP & L would have avoided the approximately $570,000,000 in costs for the common facilities to serve the abandoned Units 2, 3, and 4. The Commission having found that the decision permitting the incurring of these costs was prudent, it is appropriate that these costs be treated as cancellation costs of the abandoned units and recovered as operating expenses through amortization. Thornburg II, 325 N.C. 463, 385 S.E.2d 451.
In conclusion, we hold that the Commission's order of 5 August 1988 granting partial increase in rates and charges and its order of 1 September 1988 denying reconsideration are affected by an error of law, and for that reason:
1. We reverse the Commission's decision to include $389,442,000 in rate base;
2. We affirm the Commission's decision excluding from rate base $180,558,000 cancellation costs associated with abandoned Harris Units 2, 3, and 4, and treating that amount in a manner consistent with the other CP & L cancellation costs; and
3. We remand this case to the Commission with instructions to remove the approximately $389,000,000 from the rate base and include it with the approximately $181,000,000 to be treated as cancellation costs.
Since our decision results in the removal of approximately $389,000,000 from the rate base, N.C.G.S. § 62-133(b)(1), it will be necessary for the Commission, on remand, to determine whether a new rate of return must be fixed in accordance with N.C.G.S. § 62-133(b)(4) in order that the rates fixed by the Commission will be fair to CP & L and to the consumer as required by N.C. G.S. § 62-133(a).
The orders of the Commission are:
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
MARTIN, Justice, dissenting.
At the outset, I do not find that the evidence, viewed upon the whole record test, supports the findings by the Commission that the use of the cluster design by CP & L was prudent. N.C.G.S. § 62-94(b)(5) (1982). When the contradictory evidence and the inferences therefrom are considered, the finding of prudence is just not supported by competent, material and substantial evidence. It would serve little purpose to marshall the evidence again, but any ordinary citizen, working to pay his light bill, knows that choosing a construction design which results in the building of excess facilities costing $570,000,000 is not a prudent actionespecially when your design engineers have recommended against it. CP & L compounded this error by refusing to seize the opportunity to redesign the facility in 1975.
I agree with the majority that excess facilities, as here, cannot be considered "used and useful" under the law. Again, I agree that no part of the $570,000,000 can be included in the rate base but dissent from the majority's allowing these costs to be recovered as operating expenses through amortization. See Utilities Commission v. Thornburg, 325 N.C. 463, 385 S.E.2d 451 (Martin, J., dissenting (1989)).
I find that the proper disposition of the $570,000,000 is to classify the amount as excess plant or plant held for future use rather than cancellation costs. As plant held for future use, if all or any part of the present excess facility or plant becomes "used and useful" in the future, it can be placed into the rate base at that time with the consequent benefits to CP & L and its stockholders. If past history is any prologue to the future, this method should allow CP & L to recoup these expenses in a reasonable time and do so within the existing statutory law.
MITCHELL, Justice, dissenting.
The majority recognizes that the Commission adopted its treatment of the costs associated with the Harris Plant common *472 facilities for reasons of "equity." As Justice Martin has explained in his dissenting opinion in Utilities Commission v. Thornburg, 325 N.C. 463, 385 S.E.2d 451 (1989), in which I joined, the Commission is not a court of equity and has no equitable powers. Nor do our statutes permit the Commission, or this Court for that matter, to exclude from the rate base any costs prudently incurred in constructing a used and useful electric generating plant. The result reached by the Commission, like the result reached by the majority of this Court, may be fair, equitable or simply a reasonable way to do things. However, neither the result reached by the Commission nor the result reached by the majority of this Court complies with our statutes regulating public utility ratemaking.
As I read the record on appeal, the Commission did not conclude that any of the common facilities were not used and useful in the generation of electric power at the Harris Plant. Indeed, it does not appear that any party to these proceedings contended before the Commission that the common facilities were not used and useful. Instead, the dispute before the Commission involved whether Carolina Power & Light Company (hereinafter "CP & L") had incurred costs associated with the common facilities prudently, not whether any facility of the plant was used and useful.
The Commission made findings and concluded that the costs incurred in building the Harris Plant were prudently incurred, a conclusion with which the majority of this Court agrees. Nevertheless, although no one appears to have raised the issue, the Commission further concluded that some of the common facilities were "excess common facilities." Even if it is assumederroneously in my viewthat the Commission had the authority to treat part of the prudently incurred costs for the used and useful common facilities as "excess," I do not believe that its findings and conclusions in this regard were supported by the evidence presented.
CP & L offered evidence, which appears to have been uncontroverted, that none of the fuel handling building is unused, because portions of it not presently needed for fuel handling are being used to house other plant facilities. The Technical Support Center is a computer-equipped area located in the fuel handling building that is kept available for use by engineering and technical support personnel in the event of a plant emergency. Under Nuclear Regulatory Commission (hereinafter "NRC") regulations, this center must be housed in a building with eighteen-inch-thick reinforced concrete walls. CP & L would have had to construct such a building at the Harris Plant for the Technical Support Center, had space not been available in the fuel handling building. Although other portions of the common facilities were larger than absolutely necessary, uncontroverted testimony was introduced by CP & L to the effect that the larger facilities would "be of great benefit in the event of an emergency requiring quick repairs on a large scale" at the Harris Plant, a nuclear powered electric generating plant within thirty miles of the State Capitol at Raleigh.
Further, CP & L offered uncontroverted evidence that after the decision not to complete other nuclear units at the Harris Plant had been made, it sought and obtained studies to determine whether portions of the common facilities could be eliminated. These studies revealed that while it would be physically possible to delete portions of the common facilities, they would respond differently to seismic stresses. If CP & L made such changes, it would be required to perform new seismic studies to satisfy the NRC that the modified facilities at the nuclear plant would not be damaged in the event of an earthquake. Such studies could have revealed that major modification of plant equipment and supports already in place would be necessary in order to ensure seismic stability of the modified facilities.
Based on such information, CP & L determined that it would be cheaper to build the common facilities as originally designed and use any extra space for other plant-related purposes than to delay construction yet again during times of rapidly rising construction costs while it initiated and carried out the procedures necessary to gain *473 NRC approval for smaller facilities. Given the long history of regulatory delay in the approval and construction of the various phases of the Harris Plantwell documented in the Reports of this Court over a period of almost two decadesit is to be doubted that evidence supporting any other rational decision was available. In my view of the record, none was introduced. I conclude that the evidence before the Commission would not support a determination that any of the used and useful common facilities at the Harris Plant, or any of the prudently incurred costs of such facilities, were "excess."
In my view, the Commission has no authority in law to exclude any portion of the prudently incurred construction costs of used and useful facilities from the rate base. N.C.G.S. § 62-133(b)(1) requires that the Commission determine in every general rate case "the reasonable original costs of the public utility's property used and useful..." in providing the service rendered to the public. Such costs constitute the utility's rate base. Under N.C.G.S. § 62-133(b)(4) and (5) the Commission must set rates which will allow the utility to earn a fair return on its rate base. The use of the phrase "reasonable original costs" in N.C.G.S. § 62-133(b)(1) seems to me to require that costs for the construction of the used and useful facilities of a completed nuclear power plant be included in the rate base when, as here, those costs have been determined to have been prudently incurred. Therefore, I conclude that all such costs incurred in the construction of the Harris Plant common facilities must be included in the rate base.
For the foregoing reasons, I believe that the Commission erred in excluding a portion of the costs of common facilities from the rate base and that this Court has compounded that error by excluding all such costs from the rate base and treating them as cancellation or abandonment costs. Therefore, I dissent.
NOTES
[1] Notwithstanding the contest over proper treatment of the approximately $570,000,000, neither this figure nor the $389,442,000 figure is referred to by the Commission in its twenty-eight Findings of Fact. However, when the Commission, in Finding of Fact No. 17, found that "CP & L's reasonable original cost rate base used and useful in providing service to its North Carolina retail customers is $3,677,225,000," having excluded only $180,558,000 (Finding of Fact No. 11) of the $570,000,000 (See Order Denying Motions for Reconsideration) from the rate base, it is clear that the remaining $389,442,000 of the $570,000,000 is included in the $3,677,225,000 cost rate base found by the Commission to be used and useful.
[2] This figure may be adjusted should the Commission determine that some portion of the property, as contended by CP & L, was in fact used and useful. The Public Staff, on oral argument, quantified this adjustment at $350,000.